KRUSE, KRUSE & MIKLOSKO, INC. ET AL. *v.*
ROBERT BEEDY, EXECUTOR OF THE ESTATE OF
RAYMOND H. CLARK, DECEASED ET AL.

[No. 3-1073A130. Filed August 24, 1976. Rehearing denied October 28, 1976. Transfer denied March 23, 1977.]

*David A. Kruse, Kruse & Kruse,* of Auburn, *Charles L. Quinn, Smith & Quinn,* of Auburn, for appellants.

*Wilson Shoup,* of Angola, for appellee Beedy, *James R. Solomon, Robert J. Schmoll, Hoffman, Moppert, Solomon, Miller & Thompson,* of Fort Wayne, for appellee Union Commerce Bank.

HOFFMAN, J.—On September 1, 1970, plaintiff-appellee Raymond H. Clark, as seller (on behalf of certain principal shareholders), and defendant-appellant Kruse, Kruse & Mik-

losko, Inc. (K.K. & M., Inc.), as purchaser, entered into a written contractual agreement regarding the sale and transfer of 500 of the then outstanding 680 shares of capital stock in a corporate entity known as Eaton Creek Trout Club, Inc. (Trout Club). The respective rights, duties and obligations of the parties under the terms of such agreement represented the central issues in the trial court. The trial court ultimately entered judgment in favor of the plaintiff ordering, among other things, the cancellation of the agreement in question and the termination of their rights with respect to the shares, and finding plaintiff-appellee Clark to be entitled to repossess the shares and retain a down payment in the amount of $70,000 on behalf of the represented shareholders and granting certain injunctive relief. Defendants-appellants K.K. & M., Inc., Joseph Miklosko, Dean Kruse and Russell Kruse then filed a motion to correct errors which was overruled by the trial court, and subsequently perfected this appeal.

The agreement was in the nature of a conditional sales contract. For its part, K.K. & M., Inc. engaged to pay a total purchase price of $385,000 for the shares. Of this amount, Clark, as seller, acknowledged the receipt of a down payment of $70,000 at the time of the execution of the instrument, and K.K. & M., Inc. undertook to pay the balance of $315,000, within one year (on or before September 1, 1971) together with interest computed and payable annually at a rate of 8%. Although it was understood that K.K. & M., Inc. would seek financing under a prior, separate agreement with a lending institution known as Mortgage Loan & Correspondents, Inc. the agreement here at issue expressly provided that a "failure to obtain such financing shall not relieve Purchaser of its obligation. * * *" In addition, it was provided, among other conditions, that until the purchaser "shall have paid the entire purchase price, with interest, the parties: Shall * * * cause to be paid promptly as the same shall become due all taxes owing by said corporation; * * *" A default was defined under the terms of the agreement as a failure on the part of the pur-

chasers "to pay an installment of principal or interest as the same shall become due", or, among other things, "to perform any other of its promises, covenants, and agreements as herein provided", if such failure continued for 30 days "after mailing of notice" to the purchasers. It was further agreed that "[u]pon the occurrence of any event of default * * * all rights of Buyers under and by reason of this Agreement and in and to the said shares of stock shall forthwith cease and terminate and Sellers shall immediately be entitled to recover the same * * * ; and Buyers shall thereupon be liable to Sellers for any injury, damage, or loss occurring to Sellers by reason of such default * * * ; and Buyers shall upon any such default forfeit and surrender all right and claim to any and all payments theretofore made by them and Sellers shall be entitled to keep and retain the same as their own."

For his part, Clark promised to deposit in escrow with The First National Bank of Fremont (First National) endorsed certificates representing the 500 subject shares of stock in the Trout Club for delivery to K.K. & M., Inc. upon timely payment of the final amount of consideration. Clark also agreed that while not in default, K.K. & M., Inc. would be entitled to all voting rights incidental to ownership of the shares, to "[p]ossession of the real estate represented by said shares", and to make improvements thereon. Further, it was stipulated that, "[t]his agreement contains the entire understanding and agreement of the parties and supersedes and replaces in all respects every other agreement, understanding, or arrangement."

Plaintiff-appellee Clark filed his complaint in the Steuben Circuit Court on August 27, 1971, naming as defendants K.K. & M., Inc., Joseph Miklosko, Dean V. Kruse, Russell Kruse, First National and eleven insurance companies. Therein, Clark asserted, *inter alia*, that defendants K.K. & M., Inc., Joseph Miklosko, Dean V. Kruse and Russell Kruse had breached the above described agreement in that they had failed to cause to be paid promptly all taxes owed by the Trout Club as the same

became due. Clark further alleged that such breach continued after the giving of the agreed notice, and that thereafter K.K. & M., Inc. had indicated in writing its intention not to pay the balance of the purchase price on the due date. Clark requested a judgment (1) terminating all rights of K.K. & M., Inc. in the shares of stock, (2) declaring himself to be entitled to immediate possession thereof, (3) directing First National to deliver back the shares of stock, (4) enjoining Joseph Miklosko, Dean V. Kruse and Russell Kruse from continuing in possession and control of the Trout Club and its "property and assets", (5) terminating their employment and tenure as employees, agents, directors and officers of the Trout Club, and (6) awarding damages in the amount of $10,000. As against the aforementioned insurance companies, Clark sought permanent injunctive relief prohibiting the payment of certain proceeds of insurance to any party other than himself on behalf of the Trout Club.

Defendant First National filed a petition seeking the joinder, as additional parties defendant, of Mortgage Loan & Correspondents, Inc. (Mortgage Loan), an Illinois Corporation, and Colonial National Bank, Newburgh, Indiana (Colonial National). Therein, it was alleged that under the agreement of September 1, 1970, First National was named as escrow agent, and that on the same date an additional escrow agreement was, with the knowledge of Clark, executed between K.K. & M., Inc., Mortgage Loan and First National. Under the terms of that agreement, Mortgage Loan undertook to deposit in escrow its check to the order of K.K. & M., Inc. in the sum of $50,000. The check was to be delivered to K.K. & M., Inc. by the escrow agent upon its receipt from K.K. & M., Inc. of a fully executed promissory note in the amount of $50,000. Thereafter, at an undisclosed time, a rider to such agreement was executed authorizing Mortgage Loan to withdraw the note at any time and negotiate it to such banking institution as it might select. Subsequently, Mortgage Loan gave further escrow instructions to First National indicating

the withdrawal of the promissory note and its negotiation to Colonial National. Any payments made to First National upon the note were to be forwarded to Colonial National. In view of the fact that the complaint sought the termination of the escrow agreement and the return of the shares held in escrow, it was claimed that Mortgage Loan and Colonial National were necessary and proper parties to the disposition of the issues raised thereby. First National's petition was later granted by the trial court.

Defendants K.K. & M., Inc., Joseph Miklosko, Dean V. Kruse and Russell Kruse claimed that the clubhouse of the Trout Club represented the subject-matter of the agreement and, by reason of the fire occurring on July 28, 1971, at the clubhouse, sought to be excused from timely performance. The defendants-appellants further claimed fraudulent conduct and misrepresentation on the part of defendant Mortgage Loan to which they had looked for financing, and also alleged intermeddling on the part of plaintiff in the timely settlement and collection of fire insurance proceeds. By counterclaim, they sought reformation and/or rescission of the agreement giving as grounds therefor the following: a breach of warranty of title to the stock placed in escrow by reason of a claim to 150 of the subject shares by intervening defendant Union Commerce Bank of Cleveland, Ohio (Union Commerce), as Executor of the Estate of John M. Dempsey, deceased (a represented shareholder) and a claim of a lien upon the shares by Mortgage Loan and Colonial National; mutual mistake, or unilateral mistake on the part of K.K. & M., Inc. taken together with fraud on the part of Clark in regard to the consideration recited in the agreement; illegality of the contract due to Clark's failure to properly notify and register the stock with the Secretary of State of Indiana and with the Securities and Exchange Commission; and a failure of consideration by reason of alleged failure on the part of Clark to assign certain promissory notes held by represented shareholders and pay back wages owed by the Trout Club under proper authority.

Defendants sought a restoration of the *status quo* prior to the making of the agreement including equitable restitution by Clark for improvements allegedly made to the Club and a return of the $70,000 down payment. Further, appellants sought a return of the 500 shares held in escrow.

Intervening defendant Union Commerce claimed ownership of 150 of the subject shares. In its amended counterclaim, and cross-claim against First National, Union Commerce alleged that while Clark did have lawful authority to sell any and all of the shares of stock owned by John M. Dempsey, Clark lacked lawful authority in the following respects: (a) to agree, either verbally or in writing, that certain promissory notes executed and payable by the Trout Club to John M. Dempsey (which are in the principal amount of $101,217.67, plus accrued interest in the sum of approximately $70,000), would be released and/or transferred and assigned at any time to the purchaser as part of the $385,000 consideration set forth in the agreement; and (b) to negotiate and/or receive on Clark's own behalf $60,000 of alleged back wages for purported services rendered by Clark as part of the above stated consideration. By a cross-claim against the defendant insurance companies, Union Commerce sought to be granted the authority to present a claim for insurance recovery. In its cross-claim against defendant K.K. & M., Inc., Union Commerce averred that such defendant did not have legal excuse justifying its non-performance under the agreement and that such agreement should, therefore, be declared cancelled. Further, Union Commerce alleged that K.K. & M., Inc. was estopped from being granted rescission and/or reformation since it had continuously been in default under the agreement from and after July 23, 1971.

On October 14, 1971, the cause was venued from Steuben County to DeKalb County. Thereafter, on January 17, 1972, pursuant to the request of the defendant insurance companies, the trial court appointed a commissioner for the purpose of conserving the assets and continuing the operation of the

Trout Club insofar as possible after the fire. On May 3, 1972, defendant K.K. & M., Inc. filed a motion to consolidate the cause from which this appeal has been taken, being No. C-71-374, with a cause then pending in the Steuben Circuit Court, being No. 85-4687. Such motion was overruled on August 1, 1972.

On April 25, 1973, the trial court entered its special findings of fact and conclusions of law which were in summary, as follows: On September 1, 1970, when the agreement in question was executed, there existed a corporate entity known as Eaton Creek Trout Club, Inc. The assets of such corporation were comprised of approximately 800 acres of land reposing in Steuben County near the town of Fremont, Indiana, upon which there existed a golf course, trout ponds, a controlled hunting reserve and clubhouse facilities. Of a total of 667 shares of stock issued and outstanding in the corporation, Eva Beedy was the owner of 150 shares, Marjory N. Clark, or her Executor, was the owner of 150 shares, John M. Dempsey was the owner of 150 shares, and Maxine Ahr was the owner of 50 shares. Such holdings thus constituted, in the aggregate, more than two-thirds of such stock then issued and outstanding. On July 13, 1971, shareholder John M. Dempsey died, leaving the Union Commerce Bank of Cleveland, Ohio, as the duly qualified and acting Special Administrator-Executor of his estate. Prior to September 1, 1970, plaintiff Raymond H. Clark had obtained authority from the above named shareholders to sell their respective shares of stock in the Trout Club pursuant to powers of attorney and a court order in the case of the Estate of Marjory N. Clark, deceased.

Beginning in the early fall of 1969, extensive negotiations were undertaken between Clark, acting on behalf of the above named shareholders, and Joseph P. Miklosko, Russell Kruse and Dean V. Kruse as individuals who ultimately formed the corporation known as Kruse, Kruse & Miklosko, Inc. Such negotiations concerned the sale and purchase of the 500 shares of stock in the Trout Club owned by said shareholders. Con-

tinuing through September 1, 1970, various instruments designated as "Option Contract", "Purchase Agreement", "Closing Agreement", "Contract for Purchase of Stock", and "Agreement to Convey Stock with Escrow Arrangements" were prepared during the course of the negotiations, although none of such instruments were "effectuated * * * in the execution and tender of performance thereunder until the agreement entitled Agreement to Convey Stock with Escrow Arrangements dated September 1, 1970, * * * ."

Sometime between the 15th and 20th day of August, 1970, Derald D. Kruse, attorney for K.K. & M., Inc., prepared and mailed to Wilson Shoup, attorney for Clark, a draft of an instrument entitled "Agreement to Convey Stock with Escrow Arrangements." Such instrument provided for the sale of the 500 subject shares of stock at a purchase price of $385,000, with an unspecified sum to be paid at the time of the execution and delivery of the proposed agreement and, further, with the remainder of the purchase price to be due and payable twelve months thereafter with interest at 8% per annum. In addition, Item 6 of the agreement provided, among other things, that Clark, as seller, "warranted that the shares of stock and property represented thereby shall be free and clear of all liens, taxes, charges and encumbrances at the time the purchaser, K.K. & M., Inc. fully performed * * * ." Such agreement, however, was not executed by the parties.

Sometime after August 20, 1970, but prior to September 1, 1970, Wilson Shoup, attorney for Clark, prepared an instrument entitled, "Agreement to Convey Stock with Escrow Arrangements", such being the contract of September 1, 1970. This instrument was based upon and constituted a modification of the above mentioned instrument prepared by Derald D. Kruse. More particularly, a portion of the subsequent instrument regarding duties of "the parties" was added from form book materials in Shoup's law office. The words "and property represented thereby" were deleted from the above described provision concerning warranties, although the remainder of

such clause was not altered. The omission was an intentional deletion on behalf of Clark without intent to commit fraud against K.K. & M., Inc.; and K.K. & M., Inc. did not object to such deletion after reasonable opportunity to examine the document. Moreover, the deletion was neither a mutual mistake of Clark and K.K. & M., Inc., nor was it a unilateral mistake on behalf of K.K. & M., Inc. coupled with fraud on behalf of Clark.

The contract drafted by Shoup was examined by attorney Kruse on the morning of September 1, 1970, and was compared with the previous draft of the instrument referred to hereinabove. That afternoon the agreement drafted by Shoup was executed in the presence of all parties and their attorneys. Upon the closing of the transaction, Clark deposited in escrow with the First National Bank of Fremont the 500 shares for delivery to K.K. & M., Inc., upon payment in full of the balance of the purchase price and interest. At the same time, K.K. & M., Inc. caused to be paid to Clark the down payment of $70,000, which sum was paid entirely from the personal funds of Joseph P. Miklosko.

After September 1, 1970, and at least through August 27, 1971, when the complaint in this cause was filed, K.K. & M., Inc. had actual voting and all other rights incident to the ownership of the 500 subject shares. Further, Dean V. Kruse, Russell Kruse, and Joseph Miklosko, who were the sole stockholders, officers and directors of K.K. & M., Inc., were also the sole officers and directors of the Trout Club in addition to being the majority shareholders thereof. As such, they made all financial, managerial, and policy decisions pertaining to the Trout Club and were in exclusive possession and control of all the facilities located and operated on the Trout Club real estate. After September 1, 1970, and prior to July 23, 1971, neither Clark nor any of his principals had any further official relationship with the Trout Club.

The trial court further found that Item 6 of the final agreement "refers to various affirmative duties and obligations of

and prohibitions against certain actions of entities referred to in said Item 6 as 'the parties'; that there exists an ambiguity as to what person or persons or what entity or entities the words 'the parties' were intended by the parties to The Contract of 9-1-70 to mean; that the use of the words 'the parties' resulted from the scrivener's inadvertent error in drafting said Item 6 verbatim from a form book and that, while the Court cannot rewrite The Contract of 9-1-70, the Court should reform and/or interpret said words to express the real intention of the parties; that although all the parties signatory to said contract were represented by counsel and had an ample opportunity to examine said contract before execution, K.K. & M., Inc. did not discover the ambiguity pertaining to said words 'the parties' until sometime after this action had been commenced; that the use of the words 'the parties' in said Item 6 did not demonstrate any fraudulent intent or attempt on the part of Clark against K.K. & M., Inc."

It was found, in addition, that the consideration set forth in the contract is clear and concise and that it satisfies "the necessary element of mutuality of consideration for a binding contractual agreement between the signatories * * * ."

After September 1, 1970, through August 27, 1971, no party to the instant cause notified either the Secretary of State of Indiana or the Securities and Exchange Commission of the sale of the 500 shares in question. However, the trial court found that "it was unnecessary to notify either of said official entities or to register said five hundred shares because in the course of the sale and purchase of said shares: (a) Clark was neither an issuer, underwriter, or dealer within the meaning and purview of 15 USC 77d(1) and 15 USC 77(b), (4), (11), and (12); and (b) The sale and purchase of said shares was an isolated non-issuer transaction within the meaning of IC [1971] 23-2-1-2(b) (1), [(Burns Code Ed.)] * * * and as such, said shares of stock were exempt from registration."

The trial court further found that neither K.K. & M., Inc. nor anyone acting on its behalf had paid the taxes on the real

estate owned by the Trout Club for the second installment of 1969 and the first installment of 1970, due and payable in November of 1970, and May of 1971, respectively.

On July 23, 1971, Clark gave wirtten notice by letter to K.K. & M., Inc. of its failure to comply with the contract of September 1, 1970, pointing out as breaches of such contract the non-payment of taxes and the disposal of certain corporate assets. Such notice invoked the default provisions of the contract, stated that in the event the breaches thereof continued for a period of 30 days the rights of K.K. & M., Inc. in the subject shares would cease, and further indicated that K.K. & M., Inc. should "surrender" (sic) all payments made. The trial court found that the breaches complained of "continued uncured and without excuse through the filing of this cause on August 27, 1971, a period in excess of thirty days from the date of said written notice * * * ."

On July 28, 1971, a fire substantially destroyed and limited further operation of the clubhouse of the Trout Club. In this regard, the trial court found, however, that "said fire did not excuse K.K. & M., Inc. from performance of The Contract of 9-1-70, for the factual reasons that: (a) The five hundred shares of stock of the Trout Club, and not the clubhouse, constituted the subject matter of The Contract of 9-1-70; (b) The breaches of The Contract of 9-1-70 by K.K. & M., Inc. * * * occurred prior to the fire and were wholly unrelated to said fire; (c) K.K. & M., Inc. could in no event have paid the balance of the purchase price due under The Contract of 9-1-70 on or before September 1, 1971, from the operating profit, if any, from the clubhouse and other assets and facilities of the Trout Club between July 28, 1971, the date of said fire, and September 1, 1971, the due date of the balance of the purchase price of The Contract of 9-1-70; (d) In The Contract of 9-1-70, in Item 2(b), it was stipulated that the failure of K.K. & M., Inc. to obtain financing should not relieve K.K. & M., Inc. of its obligations under said contract, and therefore the effect, if any, of said fire upon the failure to obtain

financing to pay the balance of the purchase price under said contract would not excuse performance by K.K. & M., Inc."

The clubhouse was insured against fire under policies owned by the Trout Club. The proceeds therefrom were needed to reconstruct the damaged facility. However, between the date of the fire and September 1, 1971, Clark requested of the agents of the insurance companies concerned that proceeds not be paid to K.K. & M., Inc. or to its principals. The trial court found as to this issue that the Trout Club was, and is, the only entity entitled to such proceeds; that following his letter of notice of July 23, 1971, Clark had an interest in the Trout Club and was entitled to request that the proceeds be paid to the Trout Club; and that pursuant to the conditions of the contract of September 1, 1970, K.K. & M., Inc. could not, in any event, have applied the proceeds on the balance of the purchase price.

It was also found that on August 23, 1971, K.K. & M., Inc., by its counsel, sent written notice to Clark indicating that it would be unable to perform under the terms of the contract and, in particular, would be unable to make timely payment of the balance of the purchase price and interest due thereunder.

The trial court also found "that said written notice of August 23, 1971, contained no reference to any fact that would excuse the non-payment of the real estate taxes or the insurance premiums, or would deny the disposition of assets of the Trout Club other than in the ordinary course of business of said Trout Club; that said notice letter of August 23, 1971, did not indicate a disclaimer of responsibility by K.K. & M., Inc. for the payment of taxes or insurance premiums or for the disposition of Trout Club assets other than in the ordinary course of business; that said notice letter of August 23, 1971, which attempted to excuse performance, did not refer to any intermeddling by Clark with the payment of said fire insurance proceeds; [and] that the provisions of said notice letter of August 23, 1971, from K.K. & M., Inc. to Clark

did not excuse performance of The Contract of 9-1-70 by K.K. & M., Inc."

The contract in question was found by the trial court to be valid and enforceable. It was also found that Clark had done all things required of him under its terms. However, "having continuously failed to pay or tender payment of the balance of the purchase price under the said Contract of 9-1-70, and further having permitted and committed the continuous, unexcused and uncured acts of default", K.K. & M., Inc. was found to be "estopped from being granted rescission and/or reformation * * *."

The trial court subsequently entered judgment as follows:

"BE IT REMEMBERED that heretofore to-wit: on the 3rd day of May, 1973, The Court now renders judgment upon the Special Findings of Fact and Conclusions of Law heretofore rendered in this cause on April 25, 1973, and it is considered, adjudged, decreed and ordered that:

"As between the Plaintiff Clark and the Defendant K.K. & M., Inc., Clark is entitled: (a) To retain the $70,000.00 down payment on behalf of his principal shareholders, subject to the rights thereto of the Union Commerce Bank as hereinafter set forth; (b) To the return, repossession and delivery of the shares of stock in the Trout Club of certain of his principals which are the subject of said Contract of 9-1-70, subject to the rights thereto of the Union Commerce Bank as hereinafter set forth; (c) To judgment that the rights of the Defendant K.K. & M., Inc., in and to said five hundred shares of stock in the Trout Club are vacated, null, void, and unenforceable; (d) To a permanent injunction enjoining the Defendant K.K. & M., Inc. and its principals, agents, and representatives from possession and control of the Trout Club, the real estate of said Trout Club and the facilities and other assets of said Trout Club; (e) To a judgment terminating the status of all representatives of the Defendant K.K. & M., Inc. as officers, directors, shareholders and agents of said Trout Club; and (f) To a judgment of cancellation and forfeiture of the contract of September 1, 1970, being 'Agreement to Convey Stock with Escrow Arrangements':

"As between the Plaintiff Clark and the Defendant Union Commerce Bank as Special Administrator-Executor of the Estate of John M. Dempsey, deceased, and as between said

Defendant Union Commerce Bank as such fiduciary and the Defendant K.K. & M., Inc., the Defendant Union Commerce Bank as such fiduciary is entitled: (a) To the return, repossession and delivery of one hundred fifty shares of stock in said Trout Club owned by John M. Dempsey prior to his death; and (b) To a judgment against the Plaintiff Clark for $21,000.00, representing one hundred fifty/five hundredths, or 30% of the $70,000.00 down payment herein ordered retained by the Plaintiff Clark:

"That the First National Bank of Fremont, shall return and deliver to the Plaintiff Clark, three hundred fifty shares of the stock in Eaton Creek Trout Club held in escrow by said bank for the estate of Marjory N. Clark (150 shares), Eva Beedy (150 shares), and Maxine Ahr (50 shares), being certain of the principals of said Clark; that said bank shall return and deliver to the Union Commerce Bank of Cleveland as Special Administrator-Executor of the estate of John M. Dempsey, deceased, one hundred fifty shares of said stock in Eaton Creek Trout Club held in escrow by said bank; that upon the return of said shares as aforesaid, said bank shall not be further liable to the Plaintiff Clark or his principals, the estate of Marjory N. Clark, Eva Beedy, or Maxine Ahr, or to the Union Commerce Bank of Cleveland as fiduciary of the estate of John M. Dempsey, deceased, or to the Defendant K.K. & M., Inc., or to Russell Kruse, Dean V. Kruse, and Joseph Miklosko under the 'Agreement to Convey Stock with Excrow (sic) Arrangements' dated September 1, 1970:

"That the costs made and taxed herein are levied against the Defendant K.K. & M., Inc."

The first issue to be considered on appeal is whether certain of the findings of the trial court in regard to appellants' default are supported by sufficient evidence. It is well-established that this court can neither weigh the evidence nor determine the credibility of witnesses, but is confined to a consideration of only the evidence and reasonable inferences therefrom which support the judgment of the trial court. *Cole Real Estate Corp.* v. *Peoples Bank & Trust Co.* (1974), 160 Ind. App. 88, 310 N.E.2d 275 (transfer denied); *Wilson* v. *Jerry Miller, Inc.* (1973), 157 Ind. App. 135, 299 N.E.2d 177 (transfer denied). Moreover, when findings made pursuant to Ind. Rules of Procedure, Trial Rule

52(A), are considered on appeal, this court cannot set them aside unless they are found to be "clearly erroneous." Ind. Rules of Procedure, Appellate Rule 15(N) ; *Fisel* v. *Yoder* (1974), 162 Ind. App. 565, 320 N.E.2d 783 (transfer denied).

Error is first assigned in regard to the finding of the trial court that a reference to "the parties" appearing in Item 6 of the stock sale agreement was intended to be a reference to appellants, and that appellants were, therefore, in default under the terms of the agreement for having failed to perform a number of the obligations placed by the agreement upon "the parties." Whether the trial court was correct in finding that appellants were the parties referred to and were accordingly subject to certain obligations, represents the first issue. The question of whether the trial court properly found that appellants failed to perform such obligations and were therefore in default, is reserved for later examination.

Item 6 of the contract provides, in pertinent part, as follows:

"6. From and after the execution of this agreement until Buyers shall have paid the entire purchase price, with interest, *the parties*: Shall do all things necessary to assure that the assets and liabilities of the said corporation remain substantially unchanged except as permitted or required by this agreement and the usual and ordinary course of business of said corporation; shall do whatever is necessary to assure that the property of said corporation shall not be neglected or permitted to deteriorate beyond such deterioration as results from normal wear; * * * shall cause to be paid promptly as the same shall become due all taxes owing by said corporation; shall cause the said corporation to be insured against all losses reasonably to be expected; shall do whatever is necessary to assure that said corporation shall not dispose of the assets except in the usual course of business, * * * ." (Emphasis added.)

As stated hereinabove, the finding on this issue concluded that the intended import of the words "the parties" is ambiguous, that such usage resulted from a scrivener's inadvertent drafting error, and that the words should be inter-

preted so as to express the true intention of the parties. Although the trial court did not expressly state that the words "the parties" were intended to mean appellants, such a finding is manifest in its determination that appellants were in default for having failed to perform a number of the obligations set forth in Item 6.

The existence of ambiguity in regard to the meaning of the words "the parties" is not disputed. We turn, therefore, to the question of whether the finding that such words were intended as a reference to appellants was clearly erroneous.

It is a well-established principle of contract interpretation that contracts must be given such reasonable construction as will effectuate the intention of the parties. *Allied Structural Steel* v. *State* (1970), 148 Ind. App. 283, 287, 265 N.E.2d 49 (transfer denied). The intention of the parties is to be ascertained from an examination of the contract as a whole, giving effect to every portion of the instrument. *Wiltse* v. *Cornell* (1970), 146 Ind. App. 447, 256 N.E.2d 572; *General Ins. Co.* v. *Hutchison* (1968), 143 Ind. App. 250, 239 N.E.2d 596 (transfer denied); *Bojarski* v. *Ballard* (1942), 113 Ind. App. 6, 44 N.E.2d 200 (transfer denied).

Following the execution of the agreement here at issue, K.K. & M., Inc. was, while not in default, "entitled to all voting rights incidental to ownership of [the] shares of stock." It was also provided that "[p]ossession of the real estate represented by said shares of stock shall be given Purchaser at the execution of this agreement with the right to make improvements thereon, * * * ." These terms, when considered together with the fact that the agreement contemplated the transfer of a majority of the shares outstanding, indicate a vesting in the purchaser of complete control over the affairs of the corporation. Conversely, such provisions contemplate a lack of such control on the part of the sellers or Clark.

Among the obligations imposed by Item 6 are included the additional requirements that "the parties: * * * shall cause

the said corporation to preserve and keep in effect its corporate existence; * * * shall do whatever is necessary to assure that said corporation shall not * * * merge into any other corporation, or consolidate with any other corporation, * * * that during such time they will not permit the said corporation to pay any dividends in cash or otherwise, nor any salaries, fees, commissions, or other compensation to any of the parties hereto either directly or indirectly, * * * nor shall the said corporation be permitted to become a surety or guarantor for any other person, firm or corporation, or to make a loan, or sell any of its property on credit, * * * or to issue additional shares of stock of any class, or to amend or modify its articles of incorporation or by laws [bylaws], or take any action which would dilute or tend to dilute the value of the outstanding shares of stock * * *."

The foregoing provisions are also duties of "the parties." The duties so imposed, however, by their nature cannot be relevant to any entity lacking control over the affairs of the corporation. Accordingly, it must be concluded that the trial court did not err in holding that the ambiguous term "the parties", which precedes and modifies all of the provisions of Item 6, was intended by the contracting parties to refer to the purchaser, K.K. & M., Inc.

Appellants next contend that the terms of Item 6 of the agreement place no duty on K.K. & M., Inc. itself to preserve the corporate existence of the Trout Club, pay the taxes owing by the corporation, pay insurance premiums and prevent the disposal of its assets except in the usual course of business. Rather, it is urged that the agreement only requires K.K. & M., Inc. to "cause said corporation" to perform such obligations.

Appellants' contention in this regard is specious. If the obligations in question were not performed, then they were not caused to be done, and it matters not whether they were to be done by K.K. & M., Inc. itself, or by the Trout Club at the direction of K.K. & M., Inc. Manifestly, the provisions are

concerned with the result and not with the means. Appellants have demonstrated no error in this regard.

We next turn to the question of whether the finding that K.K. & M., Inc. was in default under the terms of the agreement was clearly erroneous. In so doing, we limit our consideration to the specific finding of default in regard to the obligation to pay taxes.

On this point, the trial court found that "the second installment of the 1969 taxes on the real estate owned by said Trout Club, which were due and payable in November of 1970, and the first installment of the 1970 taxes upon the real estate of said Trout Club which were due and payable in May of 1971, were not paid or caused to be paid by K.K. & M., Inc. or anyone on behalf of said K.K. & M., Inc. to the Treasurer of Steuben County, Indiana, prior to August 27, 1971, the date on which the complaint herein was filed; * * * ."

It was further found by the trial court that by letter dated July 23, 1971, Clark gave written notice to K.K. & M., Inc. invoking the default provisions of the agreement, and that "the breaches complained of in said notice * * * continued uncured and without excuse through the filing of this cause on August 27, 1971, a period in excess of thirty days from the date of said written notice; * * * ."

The finding of the trial court pertaining to the nonpayment of taxes is supported by the following stipulation contained in the pre-trial order:

"21. The public records of the Treasurer of Steuben County, Indiana, show that Eaton Creek Trout Club, Inc. paid no real estate taxes since September 1, 1970, to the date of the filing of the Plaintiff's Complaint; thereafter, during the court appointed Commissioner's administration, the first mortgagee thereof (First National Bank of Angola) paid the real estate taxes past due on certain real estate owned by the Eaton Creek Trout Club, Inc., on or about August 14, 1972; further, on August 14, 1972, certain real estate owned by Eaton Creek Trout Club, Inc. was sold for delinquent real estate taxes."

Accordingly, the trial court did not err in holding that K.K. & M., Inc. did not "cause to be paid * *. * all taxes" owed by Eaton Creek; that K.K. & M., Inc. was required to do so; and that such failure, continuing uncured beyond the time period stated in the letter of written notice, constituted a default under the terms of the agreement. Inasmuch as the findings hereinabove discussed support the determination that K.K. & M., Inc. was in default, it is unnecessary to examine the sufficiency of the evidence to support findings in regard to other alleged instances of default on the part of the purchaser.

Appellants next contend that the judgment of the trial court is contrary to law in that they were not in default because they were excused from performance by the doctrines of impossibility of performance and frustration of purpose, and that mutual mistake or unilateral mistake coupled with a fraud were grounds for the reformation or rescission of the contract. When considering a contention on appeal that a civil judgment is contrary to law, it must be remembered that it is only where the evidence is without conflict and leads to only one conclusion, and the trial court has reached a contrary conclusion, that such judgment will be disturbed as contrary to law. Stated differently, the test is whether it affirmatively appears that reasonable men could not have arrived at the same conclusion as did the trial court. *Dyer Constr., Inc.* v. *Ellas Constr., Inc.* (1972), 153 Ind. App. 304, 287 N.E.2d 262.

Appellants first contend that the decision of the trial court is contrary to law in that the trial court failed to find that appellants were excused from performance through an impossibility of their performance existing by reason of 1) the destruction by fire of the clubhouse, which the appellants contend was the subject-matter of the contract, 2) a fraud by Martin Small pertaining to the availability of financing, and 3) alleged "intermeddling" by Clark which prevented the payment of the insurance proceeds to appellants.

The law in Indiana in regard to impossibility of performance as a defense to a contract action is well stated in *Krause* v. *Board, etc.* (1904), 162 Ind. 278, at 283-84, 70 N.E. 264, at 265:

"We regard it as thoroughly settled that the words of a mere general covenant will not be construed as an undertaking to answer for a subsequent event, happening without the fault of the covenantor, which renders performance of the covenant itself *not merely difficult or relatively impossible, but absolutely impossible,* owing to the act of God, the act of the law, or the loss or destruction of the subject-matter of the contract. Where performance is thus rendered impossible, the inquiry naturally arises as to whether there was a purpose to covenant against such an extraordinary and therefore presumably unapprehended event, the happening of which it was not within the power of the covenantor to prevent. The tempest, for instance, may destroy that which must exist if performance of the covenant is to remain possible, and it would seem evident in such a case that it was not within the contemplation of the parties that the maker of the covenant should answer in damages for what he could in no wise control. But, on the other hand, a person entering into a charter party might be answerable for delay caused by adverse winds, since it would be presumed that the parties contracted with such a possibility in mind. *Shubrick* v. *Salmond,* 3 Burr. 1637." (Emphasis added.) Similarly, see, *Hipskind, etc.* v. *General Industries, Inc.* (1965), 246 Ind. 215, 204 N.E.2d 339.

The assertions of the appellants in regard to the asserted impossibility of their performance must be examined in light of the foregoing standard. The appellants first contend that the clubhouse fire rendered their performance impossible. However, it must be remembered that the performance required of appellants was the payment of the balance of the sale price of the stock in the Trout Club, presumably out of financing which they were to have obtained. Such performance was clearly not rendered impossible by the destruction of the clubhouse; the club had other substantial assets, was operated by a court appointed commissioner after the fire, and the clubhouse was insured. Thus, it is possible that financing

could have been obtained and, in any event, the fire did not render performance by the appellants an absolute impossibility. For these reasons, the trial court also did not commit reversible error in excluding the testimony of appellants' witness Donald Mefford.

A similar conclusion must be reached with regard to the contentions of fraud by Small and "intermeddling" by Clark. Small's non-performance of his agreement to obtain financing did not render the performance of the appellants an absolute impossibility. Furthermore, the contract provided that K.K. & M., Inc. would be bound even if Small did not perform and there is no evidence that Clark procured Small's actions. Similarly, Clark's actions to ensure that the insurance proceeds from the fire would be paid to the Trout Club to replace the clubhouse and not applied on the purchase price by K.K. & M., Inc. were proper, as found by the trial court, and also did not render appellants' performance absolutely impossible.

Appellants also assert that the foregoing actions so frustrated the purpose of the stock sale agreement as to excuse their performance. The law relative to such defense has been cogently summarized by the Supreme Court of California in the case of *Lloyd* v. *Murphy* (1944), 25 Cal.2d 48, at 53-4, 153 P.2d 47, at 50, as follows:

"Although the doctrine of frustration is akin to the doctrine of impossibility of performance (citations omitted) since both have developed from the commercial necessity of excusing performance in cases of extreme hardship, frustration is not a form of impossibility even under the modern definition of that term, which includes not only cases of physical impossibility but also cases of extreme impracticability of performance. (citations omitted). Performance remains possible but the expected value of performance to the party seeking to be excused has been destroyed by a fortuitous event, which supervenes to cause an actual but not literal failure of consideration. (citations omitted).

"The question in cases involving frustration is whether the equities of the case, considered in the light of sound public policy, require placing the risk of a disruption or complete destruction of the contract equilibrium on defendant or

plaintiff under the circumstances of a given case, (citations omitted) and the answer depends on whether an unanticipated circumstance, the risk of which should not be fairly thrown on the promisor, has made performance vitally different from what was reasonably to be expected (citations omitted). The purpose of a contract is to place the risks of performance upon the promisor, and the relation of the parties, terms of the contract, and circumstances surrounding its formation must be examined to determine whether it can be fairly inferred that the risk of the event that has supervened to cause the alleged frustration was not reasonably foreseeable. If it was foreseeable there should have been provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed."

It must be concluded that the risk of fire was a matter which should have been foreseen by the parties. Accordingly, appellants must be deemed to have assumed such risk by taking full and sole control of the Trout Club and its facilities. And, the possibility that Small would not obtain financing not only should have been foreseen by the parties, but was provided for in their agreement. As for Clark's acts in ensuring payment of the insurance proceeds only to the Trout Club, such acts did not materially or adversely affect the appellants' ability to perform and, in any event, such method of payment was a reasonably foreseeable result of a fire involving the Trout Club facilities. The appellants have shown no error in this regard.

Appellants also contend, as stated hereinabove, that they were entitled to a reformation or rescission of the stock sale agreement on the grounds that it was the result of a mutual mistake of the parties, or a unilateral mistake on their part coupled with a fraud by Clark.

The law in Indiana pertaining to the remedy of reformation is stated in *The Citizens' National Bank of Attica* v. *Judy, et al.* (1896), 146 Ind. 322, at 340, 43 N.E. 259, at 264, as follows:

"Equity will reform a written contract between the parties whenever, through mutual mistake, or mistake of

one of the parties accompanied by the fraud of the other, it does not, as reduced to writing, correctly express the agreement of the parties." *Similarly, see, Cripe et ux.* v. *Coates et ux.* (1954), 124 Ind. App. 246, 116 N.E.2d 642.

Further, this court has stated in *Pearson* v. *Winfield* (1974), 160 Ind. App. 613, at 615, 313 N.E.2d 95, at 99 (transfer denied) :

"A party seeking reformation on the ground of mutual mistake must establish by clear and satisfactory proof the true intentions common to all parties to the instrument, that a mistake was made, and that the mistake was mutual and consequently the instrument, as written, does not state the true intention or agreement of the parties.

"The primary purpose of reformation is to effectuate the common intentions of all parties to an instrument which were incorrectly reduced to writing. It follows that a grant of reformation is necessarily predicated upon a prior understanding between all parties on all essential terms. Otherwise, there would be no standard to which an instrument could be reformed."

Thus, a party seeking to reform an instrument on the ground of mutual mistake has the burden of establishing the foregoing grounds for relief. *Pearson* v. *Winfield, supra.* Similarly, a party seeking reformation on the grounds of fraud coupled with his unilateral mistake has the burden of proving the alleged fraud and his resultant mistake.

Inasmuch as the appellants had the burden of proof on the issue of reformation, they suffered a negative judgment in the trial court on such issues. Thus, in reviewing the appellants' contentions under this assignment of error this court may consider only that evidence which is most favorable to the decision of the trial court, and the appellants must establish that such evidence is without conflict and leads to only one conclusion, and the trial court reached a contrary conclusion. *Heminger* v. *Police Com'n. of City of Fort Wayne* (1974), 161 Ind. App. 72, 314 N.E.2d 827.

The particular grounds for reformation asserted by appellants are 1) that the stock sale agreement did not accurately

express the agreement of the parties as to the payment of certain debts of the Trout Club from the sale proceeds, 2) the agreement did not express the parties' reliance on Martin Small obtaining financing, and 3) the written agreement did not accurately express the subject-matter of the sale.

An examination of the facts more favorable to the appellee established by the evidence, as summarized hereinabove, reveals that such evidence does not lead to the sole conclusion that any of the foregoing grounds for reformation existed. The appellants have demonstrated no error through these contentions.

Appellants also contend that the judgment of the trial court was contrary to law because it failed to grant a rescission of the stock sale agreement. In *Stewart* v. *Ludwick* (1867), 29 Ind. 230, at 235, it is stated:

"Applications for the rescission of contracts, either for fraud or because of the failure of the opposite party to perform, are ordinarily addressed to the sound discretion of the court. A contract will not be rescinded unless both parties can be restored to their original condition; but when that can be done, and the party seeking to rescind is not in default, and has offered to restore the defaulting party to the same condition he occupied before making the contract, a decree of rescission may be rendered."

Appellants bore the burden of proof on this issue and suffered a negative judgment thereon. As shown hereinabove, they must demonstrate on appeal that the evidence on this issue was without conflict and led to the sole conclusion that they were entitled to rescission.

The grounds for rescission which appellants assert are 1) that a mutual mistake of fact existed between the parties as to the payment of Trout Club debts from the sale proceeds, and the existence of loan commitments from Small, 2) that Clark was without authority to sell the subject shares, and 3) that the stock sale agreement is void because the subject shares of stock were not properly registered. We have heretofore held

that appellants have not carried their burden on appeal of demonstrating the existence of the first of these grounds.

As to the non-registration of the stock by Clark, appellants have merely set forth in their brief xerox reproductions of thirteen pages from Burns Indiana Statutes containing provisions from the corporations and securities statutes, have quoted one case for the proposition that registration requirements are to be determined on a case by case basis, and have listed certain "facts" in evidence. No reference whatsoever is made to the Federal statutes and no argument whatsoever is presented attempting to relate facts and law or to demonstrate the illegality of the non-registration of the subject stock. In effect, the materials relevant to a decision of this issue are set forth in appellants' brief, but no rationale for a decision is offered. As a result, this issue must be deemed to be waived under Ind. Rules of Procedure, Appellate Rule 8.3(A)(7). *See, Rabb* v. *Miller* (1974), 161 Ind. App. 471, 316 N.E.2d 458 (transfer denied).

In any event the appellants correctly contend that this question must be decided on a case by case basis. *Hippensteel* v. *Karol* (1973), 159 Ind. App. 146, 304 N.E.2d 796. The evidence shows that Clark engaged in but one transaction. Appellants have not demonstrated that the trial court erred in this respect, and appellants have similarly failed to carry their burden of demonstrating error on appeal in regard to Clark's alleged lack of authority to sell the subject shares.

Our discussion of the next issue which has been raised must necessarily be prefaced with a careful examination of the nature of the transaction involved in the present controversy. By the terms of the agreement in the present case buyers engaged to pay a total purchase price of $385,000 for the shares. At the time of the execution of the instrument, seller acknowledged receipt of a down payment in the amount of $70,000 and buyers undertook to pay the balance of $315,000, plus interest, within one year. It was agreed that indorsed certificates representing the shares were to be deposited in

escrow with instructions to the depositary authorizing their delivery to buyers upon full payment of the purchase price and the performance of certain other conditions. While not in default, buyers were given rights in the shares including all voting rights incidental to ownership, possession of the real estate owned by the corporation and the right to make improvements thereon.

The agreement in question, although not so designated, is in reality a contract of conditional sale. In *Schneider* v. *Daniel* (1921), 191 Ind. 59, at 62, 131 N.E. 816, at 817, 17 A.L.R. 1410, a conditional sale was broadly defined as "a purchase for a price paid or to be paid, to become absolute upon a particular event, or a purchase accompanied by an agreement to resell upon particular terms." A distinguishing feature of a conditional sale is an agreement that title to goods sold should not pass to the vendee until the happening of a specified condition. In this regard, our Supreme Court in *Dunbar* v. *Rawles* (1867), 28 Ind. 225, at 229-30, stated:

> "In the case of *Coggill et al.* v. *Hartford and New Haven Railroad Co.*, 3 Gray 545, the law is thus stated by Bigelow, J.: 'All the cases turn on the principle that the compliance with the conditions of sale and delivery is, by the terms of the contract, precedent to the transfer of the property from the vendor to the vendee. The vendee, in such cases, acquires no property in the goods. He is only a bailee for a specific purpose. The delivery, which in ordinary cases passes the title to the vendee, must take effect according to the agreement of the parties, and can operate to vest the property, only when the contingency contemplated by the contract arises * * *.' "

> See also: *Forrest et al.* v. *Hamilton et al.* (1884), 98 Ind. 91; *Manlove* v. *Maggart* (1942), 111 Ind. App. 398, 41 N.E. 2d 633; *Southern Finance Co.* v. *Mercantile Disc. Corp.* (1923), 80 Ind. App. 436, 141 N.E. 250; *Quality Clothes Shop* v. *Keeney* (1914), 57 Ind. App. 500, 106 N.E. 541.

Further, the court in *In Re Imperial Brewing Co.* (4th Cir. 1942), 127 F.2d 766, at 769, observed:

"In a conditional sale of personal property, ordinarily possession and the right of use of the property is given to the buyer. The seller retains a certain measure of title to the property, which is often called security title, since it exists merely to secure the payment of any unpaid portion of the purchase price. The buyer receives what is often called a beneficial title, which ripens into full and absolute title when the buyer, according to the terms of the contract, has paid (or tendered) to the seller this unpaid portion of the purchase price." *See,* 175 A.L.R. 1366 (1948) ; 92 A.L.R. 304 (1934) ; 43 A.L.R. 1247 (1926) ; 17 A.L.R. 1421 (1922).

On July 1, 1935, the Uniform Conditional Sales Act, Ind. Ann. Stat. §§ 58-801—58-829 (Burns 1961), became effective in Indiana. Although the Act was subsequently repealed upon the adoption of the Indiana Uniform Commercial Code,[1] we note for purposes of discretion the following definitional provision contained therein:

"In this act 'conditional sale' means (1) any contract for the sale of goods under which possession is delivered to the buyer and the property in the goods is to vest in the buyer at a subsequent time upon the payment of part or all of the price, or upon the performance of any other condition or the happening of any contingency; * * * ."

The transaction in the present case, as evidenced by the "Agreement to Convey Stock With Escrow Arrangements", embodies the essential elements of what traditionally has been regarded as a conditional sale. Herein, the vendees were, upon the execution of the agreement, and thereafter, while not in default under its terms, accorded certain rights in the shares. The transfer of such rights represented the delivery of possession or, in a more abstract sense, the vesting in the vendees of a beneficial interest. *Cf. Legro* v. *Kelley* (1942), 311 Mass. 674, 42 N.E.2d 836. In reference to the reservation of legal title, we note that under the agreement, delivery of the endorsed stock certificates to the vendees was not authorized until the subsequent performance or fulfillment of

---

1. *See,* IC 1971, 26-1-10-102 (Burns Code Ed.).

certain conditions. In the absence of a delivery of the indorsed certificates, legal title to the shares could not have been transferred.

Particular aspects of the transfer of investment securities such as the shares of stock in question are controlled by the provisions of ch. 8 of the Indiana Uniform Commercial Code, IC 1971, 26-1-8-101—26-1-8-406 (Burns Code Ed.).[2] Therein, IC 1971, 26-1-8-309, *supra,* provides that,

> "An indorsement of a security whether special or in blank does not constitute a transfer until delivery of the security on which it appears or if the indorsement is on a separate document until delivery of both the document and the security."[3]

---

2. *See,* IC 1971, 26-1-8-101 (Burns Code Ed.); IC 1971, 26-1-8-102 (Burns Code Ed.); and the Indiana comments thereto.

3. This provision, IC 1971, 26-1-8-309 (Burns Code Ed.), is the successor to Ind. Ann. Stat. § 25-701 (Burns 1960), of the Indiana Uniform Stock Transfer Act, which provided as follows:

"Title to a certificate and to the shares represented thereby can be transferred only:

(a) By delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to the owner of the shares represented thereby, or

(b) By delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign or transfer the same or the shares represented thereby. Such assignment or power of attorney may be either in blank or to a specified person.

"The provisions of this section shall be applicable although the charter or articles of incorporation or code of regulations or by-laws of the corporation issuing the certificate and the certificate itself provide that the shares represented thereby shall be transferable only on the books of the corporation or shall be registered by a registrar or transferred by a transfer agent. [Acts 1923, ch. 24, § 1, p. 71.]"

The Indiana Uniform Stock Transfer Act, officially titled, "An act concerning the transfer of shares of stock in corporations and to make uniform the law thereof", was specifically repealed upon the adoption of the Indiana Uniform Commercial Code. *See,* IC 1971, 26-1-10-102 (Burns Code Ed.). *See, Phillips* v. *Zimring* (Fla. App. 1973), 284 So.2d 233, 13 U.C.C. Rep. 700; *Weiss v. Dempsey-Tegeler & Co.* (Tex. Civ. App. 1969), 443 S.W.2d 934, 6 U.C.C. Rep. 1091.

IC 1971, 26-1-8-309, *supra,* like its predecessor, Ind. Ann. Stat. § 25-701, *supra,* is considered to involve the transfer of legal title only and does not have reference to any disposition of equitable rights and interests.

It is not necessary at this juncture to examine the meaning of the term "delivery" as it appears in the foregoing context. It is important to note, however, that in this instance "delivery" is essential to the passing of legal title. *See, Lanning v. Poulsbo Rural Telephone Association* (1973), 8 Wash. App. 402, 507 P.2d 1218, 12 U.C.C. Rep. 535. By their agreement, the parties to the contract here at issue made delivery of the subject shares contingent upon the future performance of conditions, and thereby manifested an intent that legal title not vest in the vendees until such time, but rather, that it be withheld as a means of securing performance.

Transactions which may be characterized as conditional sales, together with other arrangements embodying the intended creation of security interests in personal property and fixtures, are now considered to be within the scope of ch. 9 of the Indiana Uniform Commercial Code, IC 1971, 26-1-9-101—26-1-9-507 (Burns Code Ed.). IC 1971, 26-1-9-102, *supra,* provides, in pertinent part, as follows:

"Policy and scope of chapter.—(1) Except as otherwise provided in section [26-1-] 9-103 on multiple state transactions and in section [26-1-] 9-104 on excluded transactions, this article [chapter] applies so far as concerns any personal property and fixtures within the jurisdiction of this state.
(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, accounts or contract rights; * * *.
(b) to any sale of accounts, contract rights or chattel paper.
"(2) This article [chapter] applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. * * * ."

Prior to the adoption of ch. 9, the substantive effect of the law governing recognized security devices varied widely

among the States. It became necessary for the courts to characterize security devices as being of a particular type, often under circumstances in which the devices utilized were not readily susceptible of classification. Indeed, it was possible that a given transaction might have been considered a conditional sale in one jurisdiction and regarded as a chattel mortgage in another. Even within a single jurisdiction the distinction between the two devices was not always clear. *See, Schneider* v. *Daniel, supra* (1921), 191 Ind. 59, 131 N.E. 816; 15 Am.Jur.2d, Chattel Mortgages, § 9, at 202-04. However, such complex pre-Code securities law has been replaced by a single body of law which recognizes but a single security device—the ch. 9 security interest.[4] *See, generally,* White & Summers, Uniform Commercial Code, ch. 22, 754-84 (1972).[5]

---

4. "Security interest" is defined in IC 1971, 26-1-1-201(37) (Burns Code Ed.), as: "an interest in personal property or fixtures which secures payment or performance of an obligation."

The intent of the drafters in respect to the scope of Article 9 is illuminated in the Official Comment pertaining to Uniform Commercial Code—Secured Transactions, § 9-102, wherein it is stated:

"The main purpose of this Section is to bring all consensual security interests in personal property and fixtures under this Article, except for certain types of transactions excluded by Section 9-104. ***.

"1. Except for sales of accounts, contract rights and chattel paper, the principal test whether a transaction comes under this Article is: is the transaction intended to have effect as security? *** When it is found that a security interest as defined in Section 1-201(37) was intended, this Article applies regardless of the form of the transaction or the name by which the parties may have christened it. The list of traditional security devices in subsection (2) is illustrative only; other old devices, as well as any new ones which the ingenuity of lawyers may invent, are included, so long as the requisite intent is found. The controlling definition is that contained in subsection (1). ***.

"The Article does not in terms abolish existing security devices. The conditional sale or bailment-lease, for example, is not prohibited; but even though it is used, the rules of this Article govern."

5. In White & Summers, Uniform Commercial Code, ch. 22, at 756 (1972), it is stated that:

"Only a few of the pre-Code legal distinctions between different pre-Code devices reappear in some form in Article nine, and they are generally attached either to the different types of collateral, e.g., goods, accounts, etc., recognized in Article Nine, or to functionally different types of security interests recognized in such collateral, e.g., possessory or non-possessory, purchase-money or non-purchase-money. Obviously, such distinctions could not be attached to different Article Nine security 'devices' for the Article recognized only one such device." (Footnotes omitted.)

In the language of ch. 9, the property subject to a security interest is termed "collateral"; the holder of a security interest or party in whose favor there is a security interest is referred to as the "secured party"; the party owing payment or other performance of the obligation secured is called the "debtor"; and the agreement which provides for a security interest is described as a "security agreement." IC 1971, 26-1-9-105, *supra*.

IC 1971, 26-1-9-102, *supra*, the basic scope provision of ch. 9, contains a single test for determining applicability—whether a transaction "is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, accounts or contract rights; * * * ." Applicability is specifically extended to a number. of recognized and frequently appearing devices which embody the intended creation of security interests by contract—"pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security." The listing of such devices is not intended to be exhaustive.

In the present case, the existence of a conditional sale is, in itself, demonstrative of an intent by the parties that a security interest be created or reserved. Furthermore, the certificates representing the shares of stock which are the subject of the security interest are also "instruments"[6] within the meaning of IC 1971, 26-1-9-102, *supra*.

---

6. IC 1971, 26-1-9-105 (g) (Burns Code Ed.), provides:

" 'Instrument means a negotiable instrument (defined in section [26-1-] 3-104), or a security (defined in section [26-1-] 8-102) or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment; ***.'

IC 1971, 26-1-8-102 (Burns Code Ed.), in pertinent part, provides:

"In this article [chapter] unless the context otherwise requires
(a) A 'security' is an instrument which
(i) is issued in bearer or registered form; and

*See, In Re Dolly Madison Industries, Inc.* (E.D.Pa. 1972), 351 F.Supp. 1038, 11 U.C.C. Rep. 926; *In Re Estate of Hinds* (1970), 10 Cal. App. 3d 1021, 89 Cal. Rptr. 341. The provisions of ch. 9 are thus clearly applicable to the transaction in question in this case.

It must next be determined whether the security interest created by such transaction is properly enforceable. IC 1971, 26-1-9-203(1), *supra*, provides as follows:

"Subject to the provisions of section [26-1-]4-208 on the security interest of a collecting bank and section [26-1-]9-113 on a security interest arising under the article [chapter] on sales [26-1-2-101—26-1-2-725], a security interest is not enforceable against the debtor or third parties unless

(a) the collateral is in the possession of the secured party; or

(b) the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops or oil, gas or minerals to be extracted or timber to be cut, a description of the land concerned. In describing collateral, the word 'proceeds' is sufficient without further description to cover proceeds of any character."

Further, IC 1971, 26-1-9-204(1), *supra*, provides that,

"A security interest cannot attach until there is agreement (subsection (3) of section [26-1-]1-201) that it attach and value is given and the debtor has rights in the collateral. It attaches as soon as all of the events in the preceding sentence have taken place unless explicit agreement postpones the time of attaching."

The above provisions, IC 1971, 26-1-9-203(1), *supra*, and

---

(ii) is of the type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

(iii) is either one [1] of a class or series or by its terms is divisible into a class or series of instruments; and

(iv) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer."
See also, The Indiana Comment to IC 1971, 26-1-8-102, *supra*.

IC 1971, 26-1-9-204, *supra,* incorporate four general requirements for the creation of an enforceable security interest:

1) There must be an agreement creating or providing for a security interest.
2) The debtor must have signed a security agreement containing a description of the collateral; or the secured party must acquire possession of the collateral.
3) The debtor must acquire rights in the collateral.
4) And, the secured party must give value.

As for the first such requirement, IC 1971, 26-1-1-201(3) (Burns Code Ed.), provides that:

" 'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this act (sections [26-1-]1-205 and [26-1-]2-208). Whether an agreement has legal consequences is determined by the provisions of this act, if applicable; otherwise by the law of contracts (section [26-1-]1-103). (Compare 'Contract.')"

Through their "Agreement to Convey Stock With Escrow Arrangements", the parties herein created a security interest by providing for the retention of title by the seller in order to secure the performance of the buyers. *See,* IC 1971, 26-1-1-201 (37) (Burns Code Ed.). *Cf. In Re Nottingham* (Ref. Dec. E.D. Tenn. 1969), 6 U.C.C. Rep. 1197 (holding agreement to be inadequate where sales contract and promissory note neither provided for title retention nor amounted to a conditional sale).

The requirement that the debtor must sign[7] a security agreement containing a description of the collateral, or that the secured party have possession of the collateral is in the nature of a statute of frauds. It is designed to minimize the possibility of later disputes concerning the terms of an agree-

---

7. IC 1971, 26-1-1-201(39) (Burns Code Ed.), provides that the term " '[s]igned' includes any symbol executed or adopted by a party with present intention to authenticate a writing."

ment or the specific items of property comprising the collateral, and to furnish notice to third parties of the interest claimed by the secured party.

There can be no doubt that the objectives of the statute of frauds provided for in IC 1971, 26-1-9-203(1), *supra*, have been fulfilled in the case at bar. The agreement of the parties is represented by a writing which is signed by the debtor; and written agreement describes the collateral as stock certificates representing 500 of the 680 shares outstanding in Eaton Creek Trout Club, Inc. of Fremont, Indiana; and the escrow arrangement permits of no dispute as to which 500 of the 680 shares outstanding comprise the collateral—possession by the depositary renders their individual identities clearly discernable.[8]

As a third pre-condition to enforceability of a security interest, IC 1971, 26-1-9-204(1), *supra*, requires that the debtor acquire rights in the collateral. This was accomplished in the instant case when, upon the execution of the agreement, the debtors obtained a beneficial interest in the shares of stock evidenced by their acquisition of all voting rights incidental to ownership, possession of the real estate owned by the corporation and the right to make improvements thereon. *See*, Annot. 30 A.L.R.3d 9, § 13, at 44-45 (1970), and cases cited therein.

The fourth and final precondition to enforceability is the requirement that the secured party give value.[9]

IC 1971, 26-1-1-201(44) (Burns Code Ed.), provides, in part, that "a person gives 'value' for rights if he acquires them * * * (d) generally, in return for any consideration sufficient to support a simple contract." Herein, the giving of value is, in a sense, the other side of the coin of the debtor's

---

8. *See*, note 13, *infra* and related text.
9. This requirement is associated with the requirement that the debtor acquire rights in the collateral. Both such requirements are stated in IC 1971, 26-1-9-204(1) (Burns Code Ed.), which provides for the attachment of security interests.

immediate acquisition of voting and other rights in the collateral. The transfer of such rights to the debtor by the secured party, being a consideration sufficient to support a simple contract, must be regarded as sufficient value given. Accordingly, it must be concluded that the security interest provided for by the agreement here at issue is enforceable.

We turn next to the question raised by the appellants in regard to the finding of the trial court that appellee Clark was entitled to retain the $70,000 down payment on behalf of his principal shareholders. Appellants regard such finding as the enforcement of a forfeiture and, citing the principle that forfeiture is a harsh remedy not favored in equity, contend that the decision of the trial court in this regard is contrary to law. From a consideration, however, of the nature of the stock sale transaction, it becomes apparent that the propriety of the trial court's finding cannot be assessed from the standpoint of the traditional principles of equity regarding the enforcement of forfeitures. The statutory provisions of ch. 9 of the Indiana Uniform Commercial Code which are inconsistent with the traditional rules of equity, particularly those provisions pertaining to debtor's rights and the remedies available to a secured party upon default, displace such equitable considerations. *See,* IC 1971, 26-1-1-103 (Burns Code Ed.).

IC 1971, 26-1-9-501, *supra,* specifies that except for the limitations imposed by its subsection (3), a secured party may, upon default by a debtor, enforce such rights as are provided in the security agreement. Further, a secured party may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure. IC 1971, 26-1-9-503, *supra,* also provides, in pertinent part, that "[u]nless otherwise agreed a secured party has on default the right to take possession of the collateral." And, a secured party in possession may sell, lease or otherwise dispose of the collateral in accordance with the provisions of IC 1971, 26-1-9-504, *supra.* A further alternative

is made available to the secured party under IC 1971, 26-1-9-505, *supra,* which provides, in pertinent part, as follows:

"(2) In any other case involving consumer goods or any other collateral *a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor* and except in the case of consumer goods to any other secured party who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or is known by the secured party in possession to have a security interest in it. *If the debtor or other person entitled to receive notification objects in writing within thirty [30] days from the receipt of the notification* or if any other secured party objects in writing within thirty [30] days after the secured party obtains possession *the secured party must dispose of the collateral under section [26-1-]9-504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation."* (Emphasis added.)

The foregoing provisions, in effect, authorize a strict foreclosure under certain limited conditions. Such a remedy was available to a secured party at common law and was also authorized under the Uniform Conditional Sales Act. In electing such a strict foreclosure, a second party accepts the collateral in complete satisfaction of the indebtedness. However, in so doing, he also foregoes any claim or right to a deficiency.[10] It is fundamental that the election of such remedy, when permitted, is attended by the secured party's retention of prior payments. He is under no duty to account to the debtor therefor. For this reason, the remedy

---

10. Strict foreclosure may be regarded as a desirable alternative by either a secured party or a debtor in default, depending upon the particular circumstances of a given transaction. A secured party may wish to forego his right to a deficiency and avoid the difficulties and hazards which sometimes attend a resale of collateral. A debtor, on the other hand, might look upon strict foreclosure as an escape from liability for a potentially large deficiency. On occasion, a debtor has attempted to compel the utilization of such remedy by an unwilling secured party. *See, Northern Financial Corp. v. Chatwood Coffee Shop, Inc.* (N.Y. Sup. Ct. 1967), 4 U.C.C. Rep. 674; White & Summers, Uniform Commercial Code, ch. 26 §§ 26-28, at 977-80.

of strict foreclosure is sometimes accompanied by apparently harsh consequences.

The Uniform Commercial Code, however, incorporates procedures which present a debtor in default with an element of choice in the matter, thereby supplanting the need for traditional equitable considerations. *Cf. Skendzel et al.* v. *Marshall et al.* (1973), 261 Ind. 226, 301 N.E.2d 641, *cert. denied,* 415 U.S. 921. Under IC 1971, 26-1-9-505(2), *supra,* "a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation." In such event, the secured party must send written notice of the proposal to the debtor.

IC 1971, 26-1-9-505(2), *supra,* further states: "[I]f the debtor * * * objects in writing within thirty [30] days from the receipt of the notification * * * the secured party must dispose of the collateral under section [26-1-]9-504."[11]

The availability of this procedure to a debtor upon default is

---

11. IC 1971, 26-1-9-504 (Burns Code Ed.), provides, in part, as follows:

"(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. Any sale of goods is subject to the article [chapter] on sales (article [chapter] 2 [26-1-2-101—26-1-2-725]). The proceeds of disposition shall be applied in the order following to

(a) the reasonable expenses of retaking, holding, preparing for sale, selling and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party;

(b) the satisfaction of indebtedness secured by the security interest under which the disposition is made;

(c) the satisfaction of indebtedness secured by any subordinate security interest in the collateral if written notification of demand therefor is received before distribution of the proceeds is completed. If requested by the secured party, the holder of subordinate security interest must seasonably furnish reasonable proof of his interest, and unless he does so, the secured party need not comply with his demand.

"(2) *If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and unless otherwise agreed, the debtor is liable for any deficiency.* \*\*\*." (Emphasis added.) *See, Cerasoli* v. *Schneider* (Del. Super. 1973), 311 A.2d 880, 13 U.C.C. Rep. 983. Also, *see,* Annot. 55 A.L.R.3d 651 (1974).

ensured by IC 1971, 26-1-9-501(3), *supra,* which provides in pertinent part, as follows:

"To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the subsection referred to below *may not be waived* or varied except as provided with respect to compulsory disposition of collateral (subsection (1) of section [26-1-]9-505) and with respect to redemption of collateral. (section [26-1-] 9-506) but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable; * * * ." (Emphasis added.)

In White & Summers, Uniform Commercial Code, ch. 26, §§ 26-28, at 980 (1972), the authors observed that,

"Although 9-501(3) stops just short of stating that the debtor cannot contract away his right to insist upon a resale of the collateral, certainly that is the meaning of 9-501 (3)(d) and (c). An agreement, which would bind the debtor to strict foreclosure and bar him from insisting upon resale, would certainly constitute a waiver under 9-501(3) of the 'debtor's right,' and it is difficult to see how one could accomplish the effect of a waiver by establishing 'standards . . . [which are] not manifestly unreasonable.' The debtor cannot contract away his hope, however faint, that a resale will produce more than the amount of the indebtedness and entitle him to a surplus." (Footnotes omitted.)

It must be noted that in the present case the contract terms regarding default and its consequences, in effect, provide only for a strict foreclosure. No other alternative is set forth. On the basis of IC 1971, 26-1-9-501(3), *supra,* however, it must be concluded that under the agreement here in issue the option to compel a resale of the collateral by means of timely objection to the proposal by Clark as the secured party to retain the collateral in satisfaction of the obligation was available to K.K. & M., Inc. as the debtor, notwithstanding the absence of an express provision therefor in the security agreement. It must be assumed that Clark, as the secured party, acted in conformity with the law and the contract provisions, and did, in fact, seek to so retain the collateral in satisfaction

of the obligation. Accordingly, it must be determined whether he complied with the requirements of IC 1971, 26-1-9-505(2), *supra,* in so doing.

Such requirements may be summarized as follows:

1) The secured party must be in possession of the collateral.
2) The secured party must give written notice of his proposal to retain the collateral in satisfaction of the obligation.
3) The debtor must be given an opportunity to object in writing to the proposal for a period of thirty days following his receipt of such notice.

The meaning of the term "possession" by the secured party under ch. 9 may be gathered from the language of IC 1971, 26-1-9-305, *supra,* which deals principally with the perfection of security interests without filing:

"A security interest in letters of credit and advices of credit (subsection (2) (a) of section [26-1] 5-116), goods, instruments, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. *If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest.* A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this article [chapter]. The security interest may be otherwise perfected as provided in this article [chapter] before or after the period of possession by the secured party." (Emphasis added.)

Thus, the possession of collateral by a bailee who has received notification[12] of the interest of a secured party is considered to be possession by the secured party. The depositary in this

12. IC 1971, 26-1-1-201(25) (Burns Code Ed.), provides that "[a] person has 'notice' of a fact when *** (b) he has received a notice or notification of it; ***."

Further, IC 1971, 26-1-1-201(26) (Burns Code Ed.), states, in part, that "[a] person 'receives' a notice or notification when (a) it comes to his attention; ***."

case filled the role of the bailee under IC 1971, 26-1-9-305, *supra. See, In Re Copeland* (D.Del. 1975), 391 F.Supp. 134. *But, Cf. In Re Dolly Madison Industries, Inc.* (E.D. Penn. 1972), 351 F.Supp. 1038, 11 U.C.C. Rep. 926, *supra.* However, the necessity for a separate formal notification of the secured party's interest appears more applicable to a situation in which a security interest in bailed goods is created at some point during the period of the bailment, rather than a case, such as the case at bar, in which the bailee has actual notice from the inception of the bailment that is merely an adjunct of a contemporaneous security arrangement.

In the present case, the terms of the depositive escrow were controlled by the security agreement itself. The receipt of notification by the depositary of the secured party's interest in the collateral is implicit in the conduct of the transaction. Accordingly, it must be concluded that the secured party was in "possession" at all times during the period in which the collateral was held in escrow.[13]

The evidence discloses that on July 23, 1971, Clark sent written notice of K.K. & M., Inc. invoking the default provisions of the agreement of September 1, 1970. Such written notice, omitting formal parts, reads as follows:

"This refers to the certain agreement dated September 1, 1970, between the undersigned as agent for the sellers and your corporation as buyers.

"You have failed to observe your promise and agreement expressed therein concerning the payment of taxes, disposal of corporate assets, and neglect and deterioration of the property of the corporation. The agreement provides that if such failures continue for 30 days after receipt of this notice it shall constitute a default and your rights to the

---

13. It is to be noted that the secured party's "possession" through the depositary also satisfies the alternative requirement contained in IC 1971, 26-1-9-203(1) (Burns Code Ed.), the ch. 9 statute of frauds.

shares of stock shall cease and you shall surrender all payments made.

"This is notice to you that, as agent for sellers, I intend to and do hereby invoke the default provisions of the said agreement."

The default provisions of the agreement, as noted previously, provide for strict foreclosure after a 30-day waiting period, a remedy which may be had under the Uniform Commercial Code, upon a failure of the buyer to object to such disposition. *See,* IC 1971, 26-1-9-505(2), *supra.* The foregoing letter, in effect, incorporates such contract provisions by reference. Such communication must be regarded as adequate notice of a proposal on the part of the secured party to retain the collateral in satisfaction of the obligation.

Under IC 1971, 26-1-9-505(2), *supra,* the 30-day period does not begin to run until notice is received by the debtor or party entitled thereto. With regard to the receipt of the written notice letter of July 23, 1971, Joseph Miklosko testified under direct examination that such notice was received by K.K. & M., Inc. prior to the occurrence of the clubhouse fire.

Such testimony establishes that Joseph Miklosko, on behalf of K.K. & M., Inc., received notice before July 28, 1971, the date of the fire which damaged or destroyed the Eaton Creek Clubhouse. This action seeking the enforcement of the foreclosure provided in the contract was not instituted until August 27, 1971, a period in excess of thirty days following the receipt of such written notice by the debtor. Although K.K. & M., Inc. did reply to Clark's letter of notice within thirty days following the receipt thereof, such reply, which speaks only upon matters related to excuse or avoidance of obligation, cannot be considered to embody an objection to the secured party's proposal to retain the collateral. On the basis of the foregoing, it must be concluded that the secured party herein

properly complied with the requirements set forth in IC 1971, 26-1-9-505(2), *supra.*

IC 1971, 26-1-9-505(2), *supra,* treats the failure of the debtor to object to such a proposal in the same manner as a mutual cancellation and satisfaction of the obligations of the debtor and the secured party, in consideration of the relinquishment by each such party of his rights against the other as they then exist. Thus, in the case at bar, Clark had a right to retain both the collateral and the payments which had been made, and was under no duty to account to K.K. & M., Inc. for any such prior payments. Similarly, K.K. & M., Inc. was under no duty to satisfy the deficiency existing under the agreement in favor of Clark. Accordingly, the trial court was correct in finding Clark to be entitled to retain the $70,000 down payment on behalf of his principal stockholders.

The next issue presented by this appeal is whether the trial court erred in denying appellants' request for a jury trial.

The availability of jury trials in civil cases in Indiana is governed by Ind. Rules of Procedure, Trial Rule 38. This court, in *Hiatt* v. *Yergin* (1972), 152 Ind. App. 497, 284 N.E.2d 834 (transfer denied), had occasion to consider the above rule and to determine its application to circumstances similar to those existing in the case at bar. In that case, it was noted that the present Trial Rule 38(A), *supra,* tracks much of the language contained in Ind. Ann. Stat. § 2-1204 (Burns 1967),[14] which provided as follows:

"Causes triable by court and by jury.—Issues of law and issues of fact in causes that, prior to the 18th day of June, 1852, were of exclusive equitable jurisdiction, shall be tried by the court, issues of fact in all other causes shall be triable as the same are now triable. In case of the joinder of causes of action or defenses, which prior to said date were of ex-

14. Ind. Ann. Stat. § 2-1204 (Burns 1967), was enacted into law in 1881, and remained unchanged until the adoption of the present Indiana Rules of Procedure in 1970.

clusive equitable jurisdiction, with causes of action or defenses which prior to said date were designated as actions at law and triable by jury—the former shall be triable by the court, and the latter by a jury, unless waived; the trial of both may be at the same time or at different times, as the court may direct: Provided, That in all cases triable by the court, issues of fact in all other causes shall be triable its information, may cause any question of fact to be tried by a jury, or the court may refer any such cause to a master commissioner for hearing and report."

Because of the substantial merger of language of the prior statute into the recently adopted Trial Rule 38(A), *supra,* this court held in *Hiatt,* at 516 of 152 Ind. App., at 844-45 of 284 N.E.2d, that "[t]he 'old' brought with it in this union, as was intended, a dowry of precedents interpreting its provisions." The traditional rules of equity in this area are well-stated in 1 Pomeroy, Equity Jurisprudence, § 231, at 410 (5th Ed. 1941), as follows:

"Where a court of equity has obtained jurisdiction over some portion or feature of a controversy, it may, and will in general, proceed to decide the whole issues, and to award complete relief, although the rights of the parties are strictly legal, and the final remedy granted is of the kind which might be conferred by a court of law." (Footnote omitted.)

*Similarly, see, Carmichael* v. *Adams et al.* (1883), 91 Ind. 526.

Thus, this court held in *Hiatt* that under Trial Rule 38, *supra,* as under the traditional rules of equity, the "right to trial by jury is determined by reference to the essential character and nature of the claim for relief sought * * * ." (At 525 of 152 Ind. App., at 850 of 284 N.E.2d.) It is further held in *Hiatt* that the proper method for a determination of the "essential character" of a cause of action is by reference to the pleadings. *Cf. Cordial* v. *Grimm* (1976), 169 Ind. App. 58, 346 N.E.2d 266.

The case at bar is quite similar on this issue to *Hiatt* v. *Yergin, supra.* Here, as in *Hiatt,* the pleader chose to plead breach of contract and to primarily allege grounds for equitable relief. The main theory of the complaint in this cause is not an action for damages, but for injunctive relief. It cannot be denied that an essential part of the case at bar was equitable. Therefore, it cannot be said that the trial court erred in holding that the whole of this cause was drawn into equity. The appellants' general request for a trial by jury was properly denied. *Hiatt* v. *Yergin, supra.*

Appellants next contend that the trial court erred in excluding certain testimony on the basis of the parol evidence rule. The primary principles of the parol evidence rule were summarized by this court in *Fort Wayne Bank Bldg. Inc.* v. *Bank Bldg. & Eq. Corp.* (1974), 160 Ind. App. 26, at 29, 309 N.E.2d 464, at 467, as follows:

"Although evidence of the intent of the parties which is extrinsic to a contract may be properly considered by a court where fraud, mistake, illegality, duress or undue influence are shown, such evidence is not admissible where these are not shown and where the terms of the instrument are susceptible of a clear and unambiguous construction. Hauck v. Second National Bank of Richmond (1972), [153] Ind. App. [245], 286 N.E.2d 852 (transfer denied)."

Although our Supreme Court held in *Weaver* v. *American Oil Co.* (1971), 257 Ind. 458, 276 N.E.2d 144, that the application of such rule might be suspended in the name of equity in a situation involving an adhesion contract and a great disparity of knowledge and bargaining power, none of such circumstances appear in the case at bar. The parties actively negotiated their agreement over a period of many months while fully advised by counsel. No unilaterally predetermined form of contract was involved and no inherent differential in bargaining power existed. The trial court correctly held that such rule was applicable in the case at bar.

The evidence which appellants contend was erroneously excluded by the trial court may be grouped into three general areas: 1) evidence of a contemporaneous collateral agreement between the parties to pay certain debts of the Trout Club from the sale proceeds, 2) evidence of the misrepresentations of Small as to his having obtained financing, and 3) evidence that the clubhouse fire prevented the consummation of financing through others.

As to the first area of evidence, it is the rule in Indiana that parol evidence of a contemporaneous collateral agreement which does not vary the terms of a written agreement is admissible, and not violative of the parol evidence rule. *Traylor* v. *Lafayette National Bank* (1973), 158 Ind. App. 552, 303 N.E.2d 672. Although the evidence here at issue satisfies the criteria enunciated in *Traylor*, any error occasioned by the exclusion of such evidence was harmless. Such evidence tended merely to establish an agreement which was to be executed upon final payment by the appellants. Inasmuch as the trial court properly found that appellants were in default prior to the time such final payment was to be made and that final payment was never made, the exclusion of such evidence of a duty of Clark's which never arose could not have harmed appellants.

As to the second area of evidence summarized hereinabove, the parol evidence rule was properly applied. The basic tenor of such evidence was that the stock sale agreement was entered into by both parties in reliance on the availability of financing through Small. However, such contract expressly provided that it was to be performed even if Small could not arrange adequate financing. Thus, the evidence now in issue would have varied the express terms of the contract and was properly excluded under the parol evidence rule. Further, such evidence would have been unavailing under the analysis set forth hereinabove pertaining to impossibility, frustration of purpose, reformation and rescission.

The third area of evidence described hereinabove was evidence that the clubhouse fire prevented the consummation of financing. The appellants assert that such evidence should have been admitted as proof on the issues of impossibility of performance and Clark's alleged "intermeddling." However, such evidence would be unavailing under the doctrine of impossibility as set forth hereinabove, and the offer to prove which was made discloses nothing about any alleged "intermeddling" by Clark. The appellants have demonstrated no error under the foregoing issues.

Appellants next contend that the trial court erred in excluding the testimony of one Dr. Frissell. Appellants assert that the trial court was in error because such testimony would have been relevant to the issue of the alleged "intermeddling" of Clark which purportedly prevented K.K. & M., Inc. from obtaining financing for the sale. However, an examination of the testimony given by the witness and the offer to prove made following the exclusionary ruling now in issue establishes that the witness would have testified that he would not have offered financing to K.K. & M., Inc. but rather was interested in assuming the obligations of K.K. & M., Inc. under the contract. The proffered testimony thus did not relate to the issue of Clark's influence, if any, on the financing of the sale. Furthermore, Clark was not bound to accept any offer of assumption made by third parties. The appellants have demonstrated no error in this regard.

The final contention made by appellants is that the trial court erred in denying their motions to consolidate this cause with an action by K.K. & M., Inc. against Martin Small, Mortgage Loan and Colonial National, resulting from Small's representations that he had obtained financing. The appellants assert that consolidation for trial should have been granted due to the existence of common issues of fact, and that because Small and Mortgage Loan were parties to the instant case, consolidation was mandated by Ind. Rules of Procedure, Trial Rule 18(A).

However, appellants' ability under Trial Rule 18(A), *supra,* to pursue collateral claims against another party is subject to the general provisions pertaining to consolidation and separation of actions stated in Ind. Rules of Procedure, Trial Rule 42:

"(A) Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

"(B) Separate trials. The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury."

This court considered substantially the same language as is contained in the present version of Trial Rule 42(A), *supra,* in *Brennan* v. *Reydell* (1963), 134 Ind. App. 298, 187 N.E.2d 492. Therein, this court at 301 of 134 Ind. App., at 494 of 187 N.E.2d, stated:

"[I]t appears that generally a consolidation of causes of action cannot be successfully demanded as a matter of right, but is to be granted or denied in the discretion of the trial court, and such ruling is not cause for reversal unless such discretion is manifestly abused. *Trook* v. *Crouch* (1923) (T.D. 1924), 82 Ind. App. 309, 137 N.E. 773. See also, *Trusler* v. *Galambos et al.* (1958), 238 Ind. 195, 200, 149 N.E.2d 550, and *Roark, Holcomb* v. *State* (1955), 234 Ind. 615, 130 N.E.2d 326; § 1411, Comment 5, Flanagan, Wiltrout & Hamilton's, Indiana Trial and Appellate Practice.

"We find in the case of *New York Cent. R. Co.* v. *Pinnell, Admx.* (1942), (T.D.), 112 Ind. App. 116, 40 N.E.2d 988, the following definition of the word, 'discretion':

'In the case of *Langnes* v. *Green* (1931), 282 U.S. 531, 541, 51 S.Ct. 243, 247, 75 L.Ed. 520, 526, the Supreme Court of the United States uses the following language in defining "discretion":

" 'The term "discretion" denotes the absence of a hard and fast rule. *The Styria* v. *Morgan,* 186 U.S. 1, 9. When invoked as a guide to judicial action it means a sound discretion, that is to say, a discretion exercised not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.' "

"We, under the foregoing authorities, cannot say, as a matter of law, that the trial court abused its discretion in this case."

Similarly, it cannot be said in the case at bar that the appellants have demonstrated that the trial court abused its discretion in denying their motion for consolidation, in light of the collateral nature of their claim against Small in regard to this action.

The appellants have demonstrated no reversible error, and the judgment of the trial court must be affirmed.

Judgment affirmed.

Staton, P.J. and Garrard, J., concur.

NOTE.—Reported at 353 N.E.2d 514.