**MARCOVICH LAND CORPORATION, an Indiana corporation, Paul March and Michael H. March, individually, Paul March and Michael H. March, d/b/a March Realty and March Realty, Appellants (Defendants below),**

v.

**J. J. NEWBERRY COMPANY, a Delaware Corporation, Appellee (Plaintiff below).**

No. 3–679A156.

Court of Appeals of Indiana, Fourth District.

Dec. 16, 1980.

Rehearing Denied Jan. 22, 1981.

Frederick J. Ball, Goldsmith, Goodman, Ball & Van Bokkelen, Highland, for appellants.

Timothy F. Kelly, Randall J. Nye, Beckman, Kelly & Smith, Hammond, Leon R. Kaminski, Newby, Lewis, Kaminski & Jones, La Porte, for appellees.

MILLER, Judge.

Paul March and Walter March (the latter being the executor of the estate of defendant Michael H. March, deceased), legal successors in interest to defendant–landlord Marcovich Land Corporation, appeal a judgment granting plaintiff–tenant, J. J. Newberry Company, a variety store chain, some $117,000, and denying the Marches the damages they requested in a counterclaim.[1] Newberry, former tenant in a building owned by Marcovich located in East Chicago, Indiana, was awarded lost business prof-

---

1. We note the instant action involves the second appeal of this case, in that Newberry had earlier appealed a judgment by the Porter Superior Court which purported to dismiss the entire action on the ground the provision requiring rebuilding was vague, unconscionable, and impossible to fulfill. That judgment was reversed in an unreported memorandum opinion of this Court handed down December 7, 1976. We observed in that opinion, which did not reach the merits of the issues, that Marcovich's successors had attacked only the first count (specific performance) of Newberry's two–count complaint in their motion to dismiss under Ind. Rules of Procedure, Trial Rule 12(B)(6), as anticipated by that rule. The instant action, which followed a change of venue to the LaPorte Circuit Court, involves Newberry's claim for damages, as opposed to its request for specific performance, the latter of which was dismissed.

its for a period of three years[2] because Marcovich refused to rebuild the structure occupied by Newberry after it was destroyed by fire. The parties had a written lease which the trial court determined was enforceable and required such reconstruction by Marcovich. The court rejected the Marches' dual contentions in their counterclaim or set off that Newberry had not cooperated in efforts to rebuild and that in any event the covenant requiring rebuilding was impossible to perform. We affirm the trial court's judgment.

On appeal, the legal successors to Marcovich present several questions for our review, which issues may be summarized as follows:

1) that the lease does not anticipate or require rebuilding where there has been a total destruction as occurred under the circumstances of the instant case;

2) that it would be "unconscionable" as well as impossible (or, as the Marches contend, commercially impractical) to require such rebuilding in light of the amount of the insurance proceeds, the time remaining on the lease, the "blighted" condition of the area, and the alleged difficulty in obtaining financing;

3) that the trial court improperly ignored the prohibitive circumstances noted in 2) above, as evidence by its findings and conclusions;

4) that Marcovich should in any event be excused from performance because Newberry did not cooperate or provide plans allegedly required by the parties' prior course of dealing; and

5) that the trial court improperly denied discovery requests by the Marches, including a motion to produce profit and loss statements of other Newberry stores in the East Chicago area, and that it made errone-

ous rulings on exhibits and testimony offered into evidence.[3]

Newberry's complaint, filed January 4, 1973, generally alleged the parties entered into their 25–year written lease agreement on September 30, 1953 with respect to real estate and the improvements thereon located in the Indiana Harbor region of the City of East Chicago, and that thereafter, on July 14, 1958, Marcovich assigned its interest in the lease to Paul March and Michael H. March as trustees operating under the name of March Realty. The parties do not dispute these general facts, nor the further assertion that a fire of unknown origin completely destroyed the building in question on December 30, 1971. Newberry's complaint also alleges, however, that Marcovich violated a "fire clause" in the parties' lease agreement by failing to reconstruct and that as a result Newberry was unable to operate its retail business (a variety store) on the premises. Accordingly, in Count I of the complaint, (which was subsequently dismissed) Newberry requested that the trial court order specific performance of the lease by requiring Marcovich to rebuild.

Count II of the complaint presents the issue involved in the instant appeal, since specific performance was prevented by the condemnation of the property on June 16, 1976 by the City of East Chicago. Newberry contends it lost net profits as a result of the failure by Marcovich to reconstruct the demised premises, and accordingly, in its complaint requested damages of $210,000. As noted above, the trial court award Newberry approximately $117,000, consisting of lost profits of about $122,000 until June 16, 1976 minus $5,000 Newberry owed under the rental obligation imposed by the lease.

Because of its significance to the instant appeal, the so–called "fire clause" relied

---

**2.** Although the remaining term of its lease was 7 years, the land had been condemned, apparently as part of an urban renewal project, some 4 years after the building burned.

**3.** At the outset we observe two issues, perhaps pertinent, not raised by the Marches. They did not argue there was a duty for the tenant to

mitigate damages by, for example, relocating. Additionally, the Marches did not directly attack the damage award itself as being based on speculative testimony, although they did present a discovery issue which indirectly challenges the award of damages which we consider below.

upon by both parties is quoted herein at the outset. That language in the lease provides as follows:

"In the event the demised premises are damaged or destroyed by fire or other casualty, or damaged by the demolition of any portion of the building necessitated by the enforcement of any law or Ordinance, or declared unsafe by any public authority, the Landlord shall, at own cost [sic] and expense, immediately repair, reconstruct and replace the demised premises, including improvements, extensions, alterations and additions to building made by Landlord or Tenant, all such work to be done in compliance with State Laws and City Ordinances. If the extent or character of such damage, destruction or unsafe condition renders the demised premises unfit for the proper conduct of the business of the Tenant, all rent shall cease and abate during the cessation of business of the Tenant and until the complete restoration of the demised premises ready for occupancy. If, however, the Tenant is able to and does continue its business in said premises pending the restoration or reconstruction of the demised premises, then a fair and just proportion of the rent shall abate until the demised premises are restored and ready for occupancy. Any rent paid in advance beyond the happening of any of the contingencies above mentioned shall be returned by the Landlord to the Tenant."

Before applying such provision in its judgment and conclusions of law, the trial court, which decided this case without intervention of a jury, arrived at the following findings of fact significant to the rights of Newberry and the successors to Marcovich's interest:

"6. That at the time the lease of September 30, 1953 was negotiated between the parties, the defendants, Paul March and Michael March, deceased, principals of the defendant, Marcovich Land Corporation, were experienced and competent real estate brokers and landlords.

7. That the defendant, Paul March, had over 40 years of experience in the real estate field which included purchasing, selling and leasing of real estate including commercial properties.

8. That the defendant, Michael March, had over 60 years of experience in the real estate field which included purchasing, selling and leasing of real estate including commercial properties.

9. That at all times during the negotiation of the lease agreement of September 30, 1953, both the plaintiff and the defendants had equal bargaining power for the purposes of negotiating said lease.

10. That from September 30, 1953 until the time of the fire (December 30, 1971) both parties to the lease had completely performed pursuant to the terms of the lease and that neither of the parties to the lease had in any way breached the lease or its terms and conditions.

11. That on December 30, 1971, the building which was the subject–matter of the lease of September 30, 1953, was complete [sic] destroyed by fire. The building was a total loss and nothing was saved.

.     .     .     .     .

13. That on December 31, 1971 the defendants were advised by J. J. Newberry Company that the plaintiff wanted the building rebuilt pursuant to the lease agreement.

14. That the 1953 lease in question was the culmination of a similar business relationship between the parties since 1926 as to the leasing of the premises for a variety store. Plaintiff built the original building with its own plans and specifications.... Each time the building was expanded, altered, modified on at least three (3) occasions plaintiff utilized its own plans and specifications and construction supervisors.... On each occasion plaintiff used its own architects.

15. That the defendants, Paul March and Michael March, deceased, demanded that the plaintiff supply them with architectural plans and specifications for the purpose of rebuilding the demised premises. Additionally the defendants requested that plaintiff extend the term of years

on the lease agreement of September 30, 1953.

16. That there is no express covenant or provision in the lease of September 30, 1953 requiring the plaintiff to extend the term of years on the original lease agreement should the fire clause be invoked; or requiring the plaintiff to supply architectural plans and specifications for the purposes of rebuilding the demised premises should the fire clause be invoked.

17. That defendants continued to demand architectural plans and specifications until May 9, 1972 when M. H. March informed plaintiff, by letter, that defendants March brothers intended to do nothing further under the lease.

18. If the defendants had complied with the fire clause in the lease agreement of September 30, 1953, one (1) year would have provided them with a reasonable time within which to build such a structure.

19. That as of December 30, 1971, the lease of September 30, 1953, had a period of six (6) years nine (9) months and one (1) day to run and that said lease would expire on September 30, 1978.

20. That on June 16, 1976 the City of East Chicago Indiana pursuant to its powers of eminent domain, condemned the property which the [sic] subject matter of the lease agreement of September 30, 1953.

21. That the plaintiff's damages will encompass the period of time from May of 1973 until June, 1976, the date on which the City of East Chicago took said property."

Significantly, the conclusions of law which accompanied the above findings determined that the lease agreement between the parties was in all respects valid, enforceable and conscionable, and that the parties to the lease had equal bargaining power when the agreement was made. Thus, since Marcovich did not rebuild, and according to the trial court was apparently not hindered in such efforts by Newberry, damages were awarded to Newberry under what the court thought to be a reasonable determination.

The ultimate award was based on the profits Newberry would have received from May of 1973 until June of 1976, (the latter being, as noted above, the date the property was condemned), apparently because it would take a year to construct a new building. Thus, the profit calculation did not include the 12 months following Michael March's abandonment of the lease in May of 1972. The findings listed specific predicted lost profits for the years (or parts thereof) 1973, 1974, 1975 and 1976.

THE LEASE PROVISION

We first address what amounts to a threshold question in this case, namely, whether the so-called "fire clause" in the parties' lease agreement applies on its face to a situation where, as here, the leased premises were not merely damaged by fire, but rather (as the trial court found) were completely destroyed with nothing saved. The Marches contend, relying principally on an early Kentucky case, *Davis v. Parker*, (1923) 200 Ky. 847, 255 S.W. 836, the language of the lease does not contemplate rebuilding where there has been such a total destruction.

We disagree. While it is true the Court in *Davis* found the lease there at issue anticipated only the restoration or reconstruction of premises which had merely been partially destroyed, as opposed to the complete rebuilding of a demised structure, it is significant that in the *Davis* case the relevant lease provision stated the landlord must "replace the buildings in the same condition as they now are" whenever they are "destroyed by fire or tempest *in such a manner as to render the same untenantable.*" *Id.* at 847, 255 S.W. at 836. (emphasis supplied by the Kentucky Court). The Court observed, "[i]f the word [destroyed] stood alone in the sentence there could be no discussion or question, . . . ." *Id.* at 849, 255 S.W. at 836. This latter situation is now before this Court. Thus, even if we were to apply the general reasoning of that case in Indiana, it is evident the instant lease provision is distinguishable in light of the fact the modifying language found in

*Davis* is omitted from the unambiguous promise in the case at bar to "repair, reconstruct and replace" the demised premises where they are "damaged *or* destroyed." (Emphasis added.)

█ Similarly, although the Marches contend in this context that "[p]arties to [a] contract are not always able to provide for all the possibilities of which they are aware," *quoting Transatlantic Financing Corp., v. United States,* (D.C.Cir.1966) 363 F.2d 312, 316 it is evident (in contrast to the position urged by the Marches) both sides in the instant litigation did anticipate and provide for what in fact occurred, namely, a fire which completely destroyed the building, consisting of the original premises plus "improvements, extensions, alterations and additions"[4] made by Newberry. An unambiguous document such as the one at bar neither requires nor permits the extrinsic interpretative evidence offered by the Marches. *New Harmony Realty Corp. v. Superior Oil Co.* (1941) 108 Ind.App. 668, 31 N.E.2d 673. Although it is unnecessary to our interpretation of such lease provision we note, in this regard, that it was perhaps partly in anticipation of the landlord's clear duty to rebuild upon complete destruction of the premises that he was elsewhere in the lease required to insure the building and improvements against fire "to the extent of the reasonable insurable value thereof."[5] We accordingly conclude the trial court did not err in its determination of the parties' intent based on the language of this lease agreement.

## THE DEFENSES OF UNCONSCIONABILITY AND IMPOSSIBILITY OF PERFORMANCE

The Marches further contend, however, that under the circumstances of this particular case, the fire clause would achieve an "unconscionable" result, and that in fact performance by rebuilding was impossible—a defense which the Marches regard as being synonymous with "impractical," or with performance which "can be done only at excessive and unreasonable cost."

█ Significantly, the Marches do not take issue with the trial court's determination, in its findings of fact, that "at all times during the negotiation of the lease agreement ... both the plaintiff and the defendants had equal bargaining power" and that the representatives from Marcovich who negotiated the lease "were experienced and competent real estate brokers and landlords." Instead, they argue impossibility and that the *application* of the contract was unconscionable. In this regard, the "unconscionability" argument raised by the successors to Marcovich is misplaced. As was recently stated by this Court in its as yet unreported opinion in *Dan Purvis Drugs v. Aetna Life Insurance Co.,* (1980) Ind.App., 412 N.E.2d 129 (1980):

"Clearly the entire thrust of the unconscionability concept is based on the circumstances existing at the time the contract was entered into and not at some later date. In order to sufficiently state a claim that a contract is unconscionable, there must be some allegations which at least raise an inference that there was unequal bargaining power at the time the contract was executed which led to the party with the lesser power to enter it unwillingly or without knowledge of its terms."

Since the Marches do not allege such lack of knowledge or unequal bargaining position, and indeed appear to base their "uncon-

4. This language is quoted from the parties' "fire clause" (set out above), which places responsibility on the landlord, Marcovich, for rebuilding both the original structure plus any improvements, regardless of whether the landlord or tenant erected them.

5. That provision states:
"LANDLORD COVENANTS AND AGREES:

. . . . . . .

(c) To keep the building of which the herein demised premises are a part or the whole, including improvements, alterations, extensions, and additions thereto whether made by Landlord or by Tenant, insured at all times against loss or damage by fire to the extent of the reasonable insurable value thereof, such policies to insure against such additional hazards as may be peculiar to the geographical location of the demised premises."

scionability" defense on events which occurred long after the lease was entered into, we conclude this theory has erroneously been applied.

The "impossibility" question raised by the Marches stands on a somewhat different footing. With regard to such affirmative defense, both parties cite and discuss this Court's opinion in *Kruse, Kruse & Miklosko, Inc. v. Beedy*, (1976) 170 Ind.App. 373, 353 N.E.2d 514, where the theory is discussed at some length. By way of background—before considering the particular merits of the Marches' argument in the case at bar—we observe the following language in *Kruse* pertaining generally to the impossibility defense in this State:

> "The law in Indiana in regard to impossibility of performance as a defense to a contract action is well stated in *Krause v. Board, etc.* (1904), 162 Ind. 278, at 283–84, 70 N.E. 264, at 265:
>
> 'We regard it as thoroughly settled that the words of a mere general covenant will not be construed as an undertaking to answer for a subsequent event, happening without the fault of the covenantor, which renders performance of the covenant itself *not merely difficult or relatively impossible, but absolutely impossible*, owing to the act of God, the act of the law, or the loss or destruction of the subject—matter of the contract. Where performance is thus rendered impossible, the inquiry naturally arises as to whether there was a purpose to covenant against such an extraordinary and therefore presumably unapprehended event, the happening of which it was not within the power of the covenantor to prevent.' "

*Id.* 394, 353 N.E.2d at 528. (emphasis supplied in *Kruse*.)

■ Significantly (in light of this language in *Kruse*), it does not appear the Marches argue it was absolutely impossible to rebuild the structure rented by Newberry at the time of the fire, since they suggest in their brief "[p]erformance is possible, but

the value (benefit) (investment) has been destroyed by an unforeseen event, a totally and completely destroyed building, . . . ." Indeed, the only evidence presented at trial which was arguably intended to show such absolute impossibility of performance concerned the purported inability of the Marcovich representatives to obtain financing for a new building under the existing lease terms with Newberry. In this regard, however, we must note not only that there was no showing such financing was essential to permit rebuilding,[6] but also that the depositions of defendant—appellant Paul March and Michael March, deceased (for whom defendant—appellant Walter March acts as executor), suggest the family in fact never tried to obtain financing based on the remaining lease term. Paul March, for example, stated as follows:

"Q.  . . . Did you ever try to obtain financing from any bank or lending institution to rebuild the building?

A.  I didn't, no.

Q.  Did anyone that you know of try to do that?

A.  It wasn't necessary yet. We hadn't gotten anywhere."

Q.  As far as you know, nobody from March Realty ever tried to obtain financing or ever approached a bank concerning financing, is that correct?

A.  Not as yet."

Similarly, Michael March asserted "I didn't have to try. I know [it was impossible]." These statements, which in essence amount to admissions by the parties they were unaware of any efforts to obtain such financing based on the original lease, were controverted (if at all) only by the unelaborated suggestion by Martin March, who was not a party either to the lease or this lawsuit, that the Marches were not able to get financing to rebuild under the remaining term of the lease. He did not explain the basis for such assertion. In this context, we

---

**6.** It is significant with respect to this question that the Marches acknowledge receiving $200,-000 in insurance proceeds which could be ap- plied toward rebuilding, along with whatever other assets the family may have had available.

also observe that the possible inability to obtain financing is not generally an unforeseeable circumstance which the parties do not consider in commercial leases or contracts. *See Kruse, Kruse & Miklosko v. Beedy, supra* at 394–95, 353 N.E.2d at 529, where the Court noted "the possibility that Small could not obtain financing not only should have been foreseen by the parties, but was provided for in their agreement." [7]

The Marches maintain, however, that apart from any issue of "absolute" impossibility, the essential question raised by this appeal is whether in Indiana impossibility of performance should include the defense that performance is "impractical" where it involves "excessive and unreasonable cost." They concede such issue is unanswered in any Indiana precedent, but contend their position should be adopted in light of the practice in other jurisdictions, *citing Transatlantic Financing Corp. v. United States, supra*, a case in which Judge Wright acknowledged such a defense but concluded it was not "commercially impractical" under a contract to require a ship carrying wheat to travel 3,000 additional miles on an original 10,000–mile trip, at an alleged cost of almost $44,000, because of the closing of the Suez Canal. *See also Aluminum Co. of America v. Essex Group, Inc.*, 499 F.Supp. 53 (U.S.D.C., W.D.Pa.1980), a case purporting to apply Indiana law.

In response to such argument, we conclude, even assuming *arguendo* the affirmative defense in Indiana extends beyond "absolute" impossibility to encompass the doctrine urged by the Marches, that the trial court could properly have determined there was no evidence before it of the kind of commercially senseless expense contended by the Marches, but rather that the parties had *anticipated* and *allocated between them* the unextraordinary risk which in fact occurred.

Before describing the evidence upon which the Marches necessarily rely, we first

observe that in *Transatlantic Financing*, the test now proposed by the Marches was described by that Court as follows:

"First, a contingency–*something unexpected*–must have occurred. Second, the risk of the unexpected occurrence must not have been allocated either by agreement or by custom. Finally, occurrence of the contingency must have rendered performance commercially impracticable." (Emphasis added.)

*Transatlantic Financing Corp. v. United States, supra* at 315. The Court in that case held "a thing is impracticable when it can only be done at an excessive and unreasonable cost." *Id.* Similarly, as stated in Comment d to § 281 of the proposed Restatement (Second) of Contracts, discussed in *Aluminum Co. v. Essex Group, Inc., supra* :

"Performance may be impracticable because *extreme* and unreasonable difficulty, expense, injury, or loss to one of the parties will be involved. . . . A mere change in the degree of difficulty or expense due to such causes as increased wages, prices of raw materials, or costs of construction unless well beyond the normal range, does not amount to impracticability since it is this sort of risk that a fixed–price contract is intended to cover." (Emphasis added.)

Turning to the evidence relied on by the Marches in support of their theory we note the uncontroverted (though challenged by objection) testimony of the Marches' expert, Richard J. Kestle, that it would cost at least $452,000 in 1972 to construct a building on the site in accordance with certain rough plans prepared by Newberry. Additionally, the Marches presented evidence they received only $200,000 in insurance proceeds, such lesser figure presumably being attributable to the fact the Marches chose not to insure the structure for its replacement

7. Although the Marches also suggest that rebuilding was "impossible" because Newberry did not provide plans and specifications for a new building, we note in this regard our determination, *infra*, that Newberry was not required under the lease to provide such plans, and that there was evidence in any event that it was the Marches, rather than Newberry, who terminated the rebuilding negotiations.

cost.[8] The Marches also presented evidence in this regard, however, in the form of testimony from a real estate appraiser using the $452,000 reconstruction figure and a six–year lease, that rebuilding would not be economically or commercially "feasible," a conclusion which he explained in an offer to prove took into account what return a prudent investor would want for his money invested in a new building in 1972, assuming such an investor "would want at least 8% on his money and we said that the recapture or depreciation rate would be 2½% or a total capitalization rate of 10½%." The same expert observed the property in question was in an "urban renewal" area in 1974 or 1975 (though not in 1972), and concluded, "I would advise my client that this is a very poor deal to get into."

▉ In viewing such evidence we are cognizant that even under the standard advocated by the Marches, the test is not simply whether a particular performance would be a bad business risk or even a "very poor deal" for a prudent investor, but rather whether there was "extreme . . . difficulty, expense, injury, or loss" which goes well beyond the normal range of what might have been expected, Comment d to the proposed Restatement (Second) of Contracts, *supra*, and whether the parties failed to allocate such risk. *Transatlantic Financing Corp. v. United States, supra.* We believe the trial court could properly have concluded the evidence in the instant case, involving regrettable but unextraordinary rebuilding considerations, did not rise to such a level, but that the risk was anticipated by the parties, and thus not expected, and that such risk was, moreover, intended to be allocated between them by the "fire clause" itself. As was observed in *Transatlantic Financing Corp. v. United States, supra* at 319:

"While it may be an overstatement to say that increased cost and difficulty of performance never constitute impracticability, to justify relief there must be more of a variation between expected cost and the cost of performing . . . than is present in this case, where the promise can legitimately be presumed to have accepted some degree of abnormal risk, . . . ."

Like the Court in *Kruse, Kruse & Miklosko v. Breedy,* which similarly reflected a defense of impossibility of performance, we believe the trial court did not err in its ultimate determination, in light of the fact "it is only where the evidence is without conflict and leads to only one conclusion, and the trial court has reached a contrary conclusion, that such judgment will be disturbed as contrary to law." *Id.* at 393, 353 N.E.2d at 527.[9] Indeed, we find that in light of the nature of the evidence which was presented, the trial court was not required (as the Marches contend) to enter specific factual findings on the defense of impossibility of performance, since the record does not show there was probative testimony of impossibility upon which such findings could be founded. Findings on such inconclusive evidence would thus be unnecessary to the trial court's decision, and therefore need not have been made. *Pepka v. Branch,* (1973) 155 Ind.App. 637, 294 N.E.2d 141. Accordingly, we find no error as regards this affirmative defense raised by the Marches.

## THE DEFENSE THAT NEWBERRY DID NOT COOPERATE

▉ Nor do we find persuasive, in light of the evidence and the trial court's findings in the instant case, the Marches' further contention that Newberry breached

---

8. We are cognizant the trial court implicitly found the building had been insured for its "reasonable insurable value" when it concluded neither party had breached the lease, but we do not find such determination to be inconsistent with the Marches' right, if they chose, to protect themselves against their ultimate liability for rebuilding by insuring for the replacement cost.

9. We observe that although the Marches also cite language from the *Kruse* case pertaining to the defense of "frustration" of the contract purpose, they have not specifically argued this defense, but instead have confined themselves to the defenses of impossibility and unconscionability discussed herein.

any duty it had to assist in rebuilding, whether by failing to provide plans and specifications for rebuilding or otherwise. As noted by the trial court, the parties' agreement did not expressly require Newberry to provide any plans and specifications. Additionally, this Court cannot conclude, despite the position taken by the Marches, such obligation is necessarily imposed by Newberry's "custom" of supplying its own plans and architects when it made alterations, particularly in light of the fact the detailed lease agreement (which is silent on this. question) permitted Newberry to make such alterations and additions without any assistance whatsoever from Marcovich, a prerogative the exercise of which should not bind Newberry to unintended new obligations.

At the same time, we find there is evidence from which the trial court could reasonably have found Newberry did cooperate, and perhaps even that it would have provided the desired plans and specifications if given an opportunity. It appears, for example, that Newberry did furnish at least rough plans of the old structure (which plans Marcovich used to collect its insurance) as well as ones for a new building; also, there was evidence it was the agents for Marcovich, rather than those acting for Newberry, who terminated negotiations between the parties regarding reconstruction. The Marches have thus not shown the trial court acted contrary to law or contrary to the evidence in finding Newberry performed its obligations under the contract.

DISCOVERY

■ The Marches additionally argue the trial court ruled improperly, so as to constitute reversible error, in its resolution of various discovery motions and objections to interrogatories. In responding to such contentions, we first observe the standard pertaining generally to questions of discovery on appeal, which is that a trial court exercises judicial discretion in ruling on discovery issues, and "this Court will interfere only if the trial court has abused its discretion." *Costanzi v. Ryan*, (1978) Ind.App., 370 N.E.2d 1333, 1337.

It is argued in the instant case the lower court abused its discretion when it failed to require Newberry to produce "profit and loss statements" for the years from 1966 until the present for an additional store (apart from the demised premises) it had in East Chicago and for its similar business in nearby Whiting, Indiana, and that the trial court should also have required Newberry to answer interrogatories relating to the following subject matters:

1) economic data on gross and net sales of Newberry's other stores (noted above) in East Chicago and Whiting going back to 1968;

2) the exact amount of damages which Newberry claimed it was entitled to, and the method used to arrive at such computation; and

3) evidence as to whether or not Newberry built other stores during the years 1972 to 1976, and whether it had utilized its own plans and specifications in those instances.

■ We first consider the particular argument advanced by the Marches regarding the "profit and loss" figures or gross and net sales of other Newberry stores, since with respect to these figures it is argued the trial court erred both by failing to require production of documents and by not ordering Newberry to respond to interrogatories.[10] In each of these two instances, the lower court sustained an objection that the requested information was irrelevant. On appeal, the Marches contend, by contrast, that such information regarding another Newberry store in East Chicago and one in Whiting would have assisted in the cross—examination of Newberry's expert on damages, Dr. Leslie Singer, and, further, that it

---

10. In this context we observe, however, that interrogatories are an inappropriate means of eliciting *documents* on discovery. As was noted in *Burger Man, Inc. v. Jordan Paper Products, Inc.*, (1976) Ind.App., 352 N.E.2d 821, 827

"although a TR. 33 interrogatory is a proper discovery method to determine the existence of documents, it is not a proper discovery tool to compel the production of documents."

would have presented evidence of "actual" damages which would be "more relevant" because "[i]t is patently obvious that these Interrogatories would be most accurate as benchmarks of the destroyed store's performance (damages) especially where one store is in the same city," as opposed to the stores "many miles away" which Dr. Singer employed in his calculations.

■ Confining our analysis to this argument raised by the Marches, which is presented without further significant explanation, we cannot agree the trial court abused its discretion in denying discovery of the requested profit and loss figures for geographically "close" stores. Initially, we note it is undisputed that Newberry's expert, Dr. Singer, did not utilize figures of the other Newberry stores, and that the Marches were provided with discovery of the economic graphs, charts and tables which he did use,[11] along with the available profit and loss figures for the store which was destroyed. Thus, the Marches had considerable opportunity to prepare their cross-examination of Dr. Singer utilizing the precise materials which he did in fact employ. In addition, in response to the Marches' argument such profit and loss figures were generally relevant to the instant litigation, we observe the Marches erroneously rely in part on Dr. Singer's assertion *at trial* that the burned store was geographically in the same "sales region" as Newberry's other East Chicago operation. By contrast, of course, our analysis must concern itself with a different point in the instant litigation: namely, the situation which confronted the trial judge when discovery was denied. Based on such fact, we conclude that at that time, it was not an abuse of discretion for that judge to determine the profits of Newberry stores (not specifically identified as "variety" stores) outside the "Indiana Harbor" region of East Chicago were not relevant (at least for the reason stated) to the question of lost profits of a store located in that region, and for him to assume the Marches could obtain their own expert, as did Newberry, to determine the proper measure of damages of a variety store in that area.[12] We do not believe, in other words, the trial court abused its discretion in failing to order the possibly burdensome production of arguably privileged economic statistics of on–going businesses merely because, as the Marches contend, they are moderately close to the store which was destroyed.

We next address the Marches' contention the trial court should have required Newberry to answer its interrogatories requesting "the exact amount of damages which plaintiff claims it is entitled to," along with the "numbers, figures, and explanation of variables or other bases used" showing how Newberry arrived at its calculation of lost profits. The trial court sustained objections that such questions involved facts and opinions of experts not subject to discovery absent a showing of good cause.[13]

■ While it is true, as the Marches contend, that the opinions and grounds therefor of an expert may be discovered by appropriate means where such expert is retained in order to testify at trial, as opposed to an expert retained merely as an advisor, *State Highway Commission v. Jones*, (1977) Ind.App., 363 N.E.2d 1018, 1022, citing Ind. Rules of Procedure, Trial Rule 26(B)(3)(b), this Court has previously determined that where such matters are solicited, the lan-

---

11. Singer employed, among other things, the Chicago Metropolitan Index of Business Activity, the Chicago Metropolitan Life Price Level Index for General Department Stores Sales Retail, and a forecast prepared by the Indiana State Budget Agency, all of which were supplied to the Marches pursuant to their discovery requests. We also note the Marches made no objection to the testimony presented by Singer, nor did they present contrary evidence on the question of damages.

12. Significantly, our resolution of this issue considers only the particular question addressed by the Marches–namely, whether the profits of these stores were relevant in light of their physical proximity to the demised store's location, and not whether such figures would have been relevant for another (unexpressed) purpose.

13. It is not contended by the Marches that such "good cause" was demonstrated.

guage of TR 26(B)(3)(b) contemplates the use of depositions upon written questions, depositions upon oral examination, or a request for production of documents and things, or some other agreed procedure, in contrast to the simple interrogatories employed in the case at bar. *Costanzi v. Ryan, supra* at 1338–39. Moreover, at least as regards the interrogatories directed to the means used to compute lost profits, the trial judge could reasonably have concluded such information had already been supplied by virtue of other interrogatories which Newberry did answer, such as the Marches' Interrogatory 67, which requested, among other things, "how loss of profits is specifically computed in itemized fashion" and "documents relied upon for said computation of loss of profits." Accordingly, we find no abuse of discretion in the lower court's ruling on these discovery questions.

Although the Marches also argue in this regard they were entitled to learn whether Newberry erected other variety stores during the time following the fire in question and whether it supplied its own plans, specifications or architects in any such undertakings, we agree with the trial court that such information would have no relevance to the instant litigation because, as noted above, this Court is in agreement with the lower court's conclusion that the parties' lease agreement did not require Newberry to provide such assistance, but rather that it unequivocally required Marcovich to rebuild.

### EVIDENTIARY ISSUES

In the final argument of their appeal, the Marches contend the trial court improperly excluded certain offered evidence from its consideration. In particular, it is urged the court erred in not admitting exhibits consisting of letters between the parties regarding rebuilding, written after the fire but before the commencement of litigation, and in sustaining an objection to testimony by the Marches' expert, Smitley, as to the exact annual net income return a "prudent investor" would desire in order to justify rebuilding under the general circumstances involved in the case at bar.

With respect to the first of these contentions, the trial court sustained an objection by Newberry that the letters (or parts thereof) which the Marches sought to introduce were inadmissible because they involved compromise negotiations between the parties. As noted above, such letters were written prior to the commencement of litigation, although several of the documents mentioned that "legal action" should perhaps be initiated, and they generally involved the parties' negotiations regarding rebuilding and a possible extension of the lease agreement.

The Marches contend, citing *Lyon v. Aetna Life Insurance Co.*, (1942) 112 Ind.App. 573, 44 N.E.2d 186, that Newberry opened up the door to the admission of all such documents when it introduced into evidence (apparently in the form of excerpts from the letters quoted in depositions which were introduced) several of the letters. They also contend the letters were not in fact attempts at compromise. While it is true, as the Marches allege, the introduction of a portion of correspondence on a particular subject opens the door to remaining correspondence between the parties relating to the same matter, we conclude that even if such principle has any application to the instant situation, the excluded documents do not, as the Marches allege, even arguably represent "admissions of the parties' understandings of the intent of the fire clause at its inception," or "admissions" of unconscionability or extreme impracticability of performance. As noted above, this Court has already determined the fire clause itself was unambiguous in its requirement of rebuilding, and that the trial judge could reasonably have concluded the parties did not intend for Newberry to provide any plans or specifications. Of the various excluded documents, the three written by agents of Newberry clearly involve no such "admissions," since they simply refer to an "inability to reach a mutually satisfactory agreement," and reiterate that company's position the lease itself is unambiguous and that "it is our conclusion that [the] lease imposes an absolute obligation on the landlord to restore the premises." It

is difficult to see how the Marches were harmed by exclusion of such statements, although it is true the letters also involve Newberry's apparent efforts to facilitate rebuilding by considering a longer lease term and by providing rough plans to be submitted to the Marches' own architect for further consideration. Similarly, it is difficult for this Court to see in what manner two other letters, apparently written by Michael March and directed to Newberry, could represent "admissions" by the latter of anything, although it is true such letters stated in conclusory fashion the writer's determination, *as already expressed in admitted evidence*, Marcovich "cannot afford" to provide its own plans and specifications, that it could not obtain essential financing without a longer lease term, and that it had been "customary procedure" for Newberry to take care of the interiors of its store buildings. Both letters encouraged Newberry to take legal action on its claims. We do not believe it was error to exclude those documents for the reasons argued.

■ Similarly, we find the trial court did not err when it excluded certain testimony, namely, the determination of the Marches' expert, Smitley, that it would take an annual rental income of $47,460 to justify rebuilding as a reasonable investment, as well as additional testimony that the $200,000 insurance proceeds were offered to Newberry to allow it to rebuild under a "Remedies of Tenant" clause found in the parties' lease. Since, as noted above, this Court has previously determined there was no showing in this case of the kind of extreme impracticability and unallocated risk contemplated in the cases cited by March, a determination which already takes into account the various conclusions drawn by Smitley as to what a prudent investor might do, we conclude it was not error for the trial court to have excluded such testimony regarding what a reasonable investor would have done in the instant case. Even with such a showing, the risk was not extreme or unallocated. Moreover, although it is true, as the Marches contend, that a "Remedies of Tenant" clause gave Newberry the *option* of rebuilding, it also was not

error for the trial court to refuse to permit testimony regarding a refused offer of such proceeds to Newberry for the purpose of rebuilding, since such evidence would not, we believe, demonstrate with any probative value "that plaintiff [Newberry] recognized the absurdity and 'commercial senselessness' of this situation," as opposed simply to a determination by Newberry that it did not want to construct its own building. Indeed, Michael March, deceased, admitted by deposition that he believed the Newberry agent with whom he dealt rejected the offered insurance proceeds merely because he was a "lame duck" and "didn't know whether he had a job or he didn't" in light of alleged management reorganizations at Newberry.

For the reasons set forth herein, the decision of the trial court is affirmed.

YOUNG, P. J., and CHIPMAN, J., concur.